Pro Se 7 (Rev. 12/16) Complaint for Employment Discrimination

# UNITED STATES DISTRICT COURT

for the

District of Columbia

Civil D

|  |  |
|---|---|
| Nathan Strong | Case: 1:26–cv–00935    JURY DEMAND<br>Assigned To : Unassigned<br>Assign. Date : 3/17/2026<br>Description: Employ. Discrim. (H–DECK) |

*Plaintiff(s)*
*(Write the full name of each plaintiff who is filing this complaint.*
*If the names of all the plaintiffs cannot fit in the space above,*
*please write "see attached" in the space and attach an additional*
*page with the full list of names.)*

Jury Trial: *(check one)* ☑Yes ☐No

-v-

Jamieson Greer,

in official capacity as Acting Special Counsel,

U.S. Office Of Special Counsel

*Defendant(s)*
*(Write the full name of each defendant who is being sued. If the*
*names of all the defendants cannot fit in the space above, please*
*write "see attached" in the space and attach an additional page*
*with the full list of names.)*

## COMPLAINT FOR EMPLOYMENT DISCRIMINATION

**I.    The Parties to This Complaint**

  **A.    The Plaintiff(s)**

    Provide the information below for each plaintiff named in the complaint. Attach additional pages if
    needed.

| | |
|---|---|
| Name | Nathan Strong |
| Street Address | 240 S. Reynolds St, #102 |
| City and County | Alexandria, VA |
| State and Zip Code | 22304 |
| Telephone Number | (202) 709-6123 |
| E-mail Address | nathanostrong@gmail.com |

  **B.    The Defendant(s)**

    Provide the information below for each defendant named in the complaint, whether the defendant is an
    individual, a government agency, an organization, or a corporation. For an individual defendant,
    include the person's job or title *(if known)*. Attach additional pages if needed.

RECEIVED

MAR 1 7 2026

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

Page 1 of 6

Pro Se 7 (Rev. 12/16) Complaint for Employment Discrimination

Defendant No. 1

    Name — Jamieson Greer

    Job or Title *(if known)* — Special Counsel

    Street Address — U.S. Office of Special Counsel, 1730 M Street NW, Suite 218

    City and County — Washington, DC

    State and Zip Code — 20036

    Telephone Number —

    E-mail Address *(if known)* —

Defendant No. 2

    Name —

    Job or Title *(if known)* —

    Street Address —

    City and County —

    State and Zip Code —

    Telephone Number —

    E-mail Address *(if known)* —

Defendant No. 3

    Name —

    Job or Title *(if known)* —

    Street Address —

    City and County —

    State and Zip Code —

    Telephone Number —

    E-mail Address *(if known)* —

Defendant No. 4

    Name —

    Job or Title *(if known)* —

    Street Address —

    City and County —

    State and Zip Code —

    Telephone Number —

    E-mail Address *(if known)* —

Pro Se 7 (Rev. 12/16) Complaint for Employment Discrimination

### C.    Place of Employment

The address at which I sought employment or was employed by the defendant(s) is

| | |
|---|---|
| Name | U.S. Office of Special Counsel, |
| Street Address | 1730 M Street NW, Suite 218 |
| City and County | Washington DC |
| State and Zip Code | 20036 |
| Telephone Number | |

## II.    Basis for Jurisdiction

This action is brought for discrimination in employment pursuant to *(check all that apply)*:

☐    Title VII of the Civil Rights Act of 1964, as codified, 42 U.S.C. §§ 2000e to 2000e-17 (race, color, gender, religion, national origin).

*(Note:  In order to bring suit in federal district court under Title VII, you must first obtain a Notice of Right to Sue letter from the Equal Employment Opportunity Commission.)*

☐    Age Discrimination in Employment Act of 1967, as codified, 29 U.S.C. §§ 621 to 634.

*(Note:  In order to bring suit in federal district court under the Age Discrimination in Employment Act, you must first file a charge with the Equal Employment Opportunity Commission.)*

☑    Americans with Disabilities Act of 1990, as codified, 42 U.S.C. §§ 12112 to 12117.

*(Note:  In order to bring suit in federal district court under the Americans with Disabilities Act, you must first obtain a Notice of Right to Sue letter from the Equal Employment Opportunity Commission.)*

☑    Other federal law *(specify the federal law)*:

Rehabilitation Act of 1973, as amended, 29 U.S.C. §§ 791, 794, 794(d), and 794a

☐    Relevant state law *(specify, if known)*:

☐    Relevant city or county law *(specify, if known)*:

Pro Se 7 (Rev. 12/16) Complaint for Employment Discrimination

## III.    Statement of Claim

Write a short and plain statement of the claim. Do not make legal arguments. State as briefly as possible the facts showing that each plaintiff is entitled to the damages or other relief sought. State how each defendant was involved and what each defendant did that caused the plaintiff harm or violated the plaintiff's rights, including the dates and places of that involvement or conduct. If more than one claim is asserted, number each claim and write a short and plain statement of each claim in a separate paragraph. Attach additional pages if needed.

A.    The discriminatory conduct of which I complain in this action includes *(check all that apply)*:

☐    Failure to hire me.

☑    Termination of my employment.

☐    Failure to promote me.

☑    Failure to accommodate my disability.

☑    Unequal terms and conditions of my employment.

☑    Retaliation.

☑    Other acts *(specify)*:    Disability-based hostile work environment; constructive discharge

*(Note: Only those grounds raised in the charge filed with the Equal Employment Opportunity Commission can be considered by the federal district court under the federal employment discrimination statutes.)*

B.    It is my best recollection that the alleged discriminatory acts occurred on date(s)

C.    I believe that defendant(s) *(check one)*:

☑    is/are still committing these acts against me.

☐    is/are not still committing these acts against me.

D.    Defendant(s) discriminated against me based on my *(check all that apply and explain)*:

☐    race

☐    color

☐    gender/sex

☐    religion

☐    national origin

☐    age *(year of birth)*                    *(only when asserting a claim of age discrimination.)*

☑    disability or perceived disability *(specify disability)*

Hidradenitis Suppurativa

E.    The facts of my case are as follows. Attach additional pages if needed.

Pro Se 7 (Rev. 12/16) Complaint for Employment Discrimination

Attached.

*(Note: As additional support for the facts of your claim, you may attach to this complaint a copy of your charge filed with the Equal Employment Opportunity Commission, or the charge filed with the relevant state or city human rights division.)*

## IV.    Exhaustion of Federal Administrative Remedies

A.      It is my best recollection that I filed a charge with the Equal Employment Opportunity Commission or my Equal Employment Opportunity counselor regarding the defendant's alleged discriminatory conduct on *(date)*
10/27/2022

B.      The Equal Employment Opportunity Commission *(check one)*:

☑       has not issued a Notice of Right to Sue letter.

☐       issued a Notice of Right to Sue letter, which I received on *(date)* _____ .

*(Note:  Attach a copy of the Notice of Right to Sue letter from the Equal Employment Opportunity Commission to this complaint.)*

C.      Only litigants alleging age discrimination must answer this question.

Since filing my charge of age discrimination with the Equal Employment Opportunity Commission regarding the defendant's alleged discriminatory conduct *(check one)*:

☐       60 days or more have elapsed.

☐       less than 60 days have elapsed.

## V.    Relief

State briefly and precisely what damages or other relief the plaintiff asks the court to order.  Do not make legal arguments.  Include any basis for claiming that the wrongs alleged are continuing at the present time.  Include the amounts of any actual damages claimed for the acts alleged and the basis for these amounts.  Include any punitive or exemplary damages claimed, the amounts, and the reasons you claim you are entitled to actual or punitive money damages.

Pro Se 7 (Rev. 12/16) Complaint for Employment Discrimination

Attached.

## VI.    Certification and Closing

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

### A.      For Parties Without an Attorney

I agree to provide the Clerk's Office with any changes to my address where case–related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing:          03/13/2026

Signature of Plaintiff    Nathan Strong    *Nathan Strong*

Printed Name of Plaintiff    Nathan Strong

### B.      For Attorneys

Date of signing:

Signature of Attorney

Printed Name of Attorney

Bar Number

Name of Law Firm

Street Address

State and Zip Code

Telephone Number

E-mail Address

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

NATHAN STRONG
   *Plaintiff,*

  v.

JAMIESON GREER,
in official capacity as
Acting Special Counsel,
U.S. Office Of Special Counsel

   *Defendant*

Civil Action No. _____

**COMPLAINT**

**I. Introduction**

This is a civil action for disability discrimination under the Rehabilitation Act of 1973, 29 U.S.C. § 701 et seq. Plaintiff Nathan Strong worked at the United States Office of Special Counsel ("OSC") as an Information Technology Specialist from September 2021 until November 2022. ███████████████████████████████████

████████████████████████████████████████████████

Beginning in September 2022, after Plaintiff used disability-related sick leave and requested full-time telework as a reasonable accommodation, OSC responded by increasing scrutiny of Plaintiff's attendance, imposing additional in-office compulsory in-office attendance requirement , and treating his medically necessary leave as a compliance issue rather than engaging in the interactive accommodation process. The events described occurred in a sequence in which Plaintiff's use of disability-related leave, submission of a reasonable-accommodation request, and objections to the measures imposed on him were each followed by additional scrutiny, new work restrictions, and further employment actions implemented by agency officials.

1

During the same period, OSC officials imposed undocumented employment restrictions, circulated Plaintiff's medical information beyond the supervisory chain, and advanced disciplinary measures based on pretextual grounds. These actions were taken because of Plaintiff's disability and in retaliation for his protected activity, including his request for reasonable accommodation and his objections to discriminatory treatment. The escalating restrictions, denial of accommodation, and misuse of Plaintiff's medical information aggravated Plaintiff's condition and culminated in a suspension notice and Plaintiff's resignation on November 18, 2022.

Plaintiff brings this action for failure to provide a reasonable accommodation, interference with protected rights, retaliation, disparate treatment, hostile work environment, misuse of medical information, and constructive discharge. Plaintiff seeks compensatory damages, equitable relief, attorney's fees, and such other relief as the Court deems just and proper.

## II. Jurisdiction and Venue

This Court has subject-matter jurisdiction under 29 U.S.C. § 794a(a)(1) and 42 U.S.C. § 2000e-16(c), which authorize civil actions against federal executive agencies for violations of the Rehabilitation Act of 1973. This action arises solely under the Rehabilitation Act and the standards incorporated from the Americans with Disabilities Act, and it seeks relief for disability discrimination, denial of reasonable accommodation, retaliation, interference with protected rights, hostile work environment, constructive discharge, and unlawful handling and disclosure of disability-related medical information.

Plaintiff initiated the federal-sector equal employment opportunity process on October 27, 2022 by filing a formal complaint of disability discrimination with the United States Office

2

of Special Counsel pursuant to 29 C.F.R. Part 1614. OSC assigned the matter complaint number EEO-23-0001. No final agency decision issued within 180 days of that filing. In fact, the agency did not transmit a document styled as a Final Agency Decision until December 17, 2025, 1,147 days after the complaint was filed. Under 29 C.F.R. § 1614.407(b) and 42 U.S.C. § 2000e-16(c), Plaintiff was therefore entitled to file a civil action in federal district court after 180 days on April 25, 2023.

Plaintiff elected to continue the administrative process and requested a hearing before an EEOC Administrative Judge on September 10, 2023. The proceedings were later stayed. On September 15, 2025, Plaintiff withdrew the hearing request while expressly reserving the right to pursue a civil action and without requesting issuance of a Final Agency Decision. Federal-sector discrimination claims proceed de novo in district court regardless of the outcome of administrative proceedings, and exhaustion is satisfied once the complainant has pursued the administrative process or the statutory waiting period has elapsed.

On December 17, 2025, OSC transmitted a document styled as a Final Agency Decision. That document is referenced solely to establish exhaustion and identify explanations articulated by the agency during the administrative process. Plaintiff does not seek judicial review of that document, and this action proceeds de novo under 29 U.S.C. § 794a(a)(1). To the extent the ninety-day filing period described in 29 C.F.R. § 1614.407(c) applies, this action is filed within ninety days of that issuance. Accordingly, the action is timely under either § 1614.407(b) or § 1614.407(c).

This action is not a mixed case within the meaning of the Civil Service Reform Act. Plaintiff does not seek review of any removal, suspension, reduction in grade or pay, or other appealable action under 5 U.S.C. §§ 7512 or 7701 and does not invoke the jurisdiction of the

3

Merit Systems Protection Board. The claims asserted arise solely under the Rehabilitation Act and challenge discriminatory working conditions, denial of reasonable accommodation, retaliation, interference with protected rights, hostile work environment, constructive discharge, and unlawful handling of disability-related medical information.

Venue is proper in the United States District Court for the District of Columbia under 28 U.S.C. § 1391(e) because the events giving rise to these claims occurred in this District and the United States Office of Special Counsel maintains its headquarters in Washington, D.C.

### III. Factual Allegations

Plaintiff was employed by the United States Office of Special Counsel ("OSC") as an Information Technology Specialist from approximately September 2021 until his resignation in November 2022. ███████████████████████████████

███████████████████████████

In August and early September 2022, Plaintiff used approved sick leave due to disability-related flare-ups. Shortly thereafter, OSC initiated a series of actions that collectively amounted to discriminatory treatment, retaliation, and a hostile work environment. The conduct described in this Complaint was undertaken by officials acting in their capacities as OSC employees, including: **Smita Patel** (then-Chief Information Officer), **Ammar Ahmad** (Chief Information Officer after Patel and supervisor of Hall), **Vance Hall** (Plaintiff's immediate supervisor), **Leigh Ann Massey** (HR Chief and Medical Review Officer), **Amy Beckett** (senior litigation attorney), **Susan Ullman** (General Counsel and Beckett's supervisor), **Kim Baxter** (Deputy Special Counsel and Ahmad's manager), **Nicole Brightbill** (senior legal advisor to the Special Counsel), **Karl Kammann** (Chief Operating Officer), **Bruce Gipe** (Former COO), and **Jessica McDaniels** (HR assistant).

Each of these officials' actions, as described below, are attributable to OSC. These events occurred in a sequence in which Plaintiff's disability-related leave usage, submission of a reasonable-accommodation request, and subsequent objections to the disability-based restrictions imposed on him were followed by successive increases in workplace scrutiny, compulsory in-office attendance requirement, performance actions, and ultimately disciplinary proceedings.

**A. Plaintiff's Medical Condition, Work Limitations, Prior Telework Performance, and Recurrence**



5



████████████████████████████████████

## B. Prelude and Context: Early Disability-Based Leave Interference and Unlawful Medical Inquiry (January–June 2022)

Plaintiff alleges a recurring and escalating pattern in which OSC treated his disability-related leave and related requests for protection as grounds for harassment, retaliation, disparate treatment, and interference rather than as protected medical matters. Before July 2022, Patel responded to Plaintiff's illness-related leave with escalating hostility and efforts to convert protected leave into a basis for negative action. During that same period, Plaintiff's submitted sick leave was changed to AWOL and his pay reduced through a concealed process later tied to Beckett and Ullman. After the settlement, Ahmad continued the same method through disability-related leave restrictions, new workplace constraints, and false disciplinary and performance materials, apparently under the influence or direction of Beckett and Ullman. Plaintiff does not seek independent relief in this action for any pre-July 2022 event standing alone. Plaintiff alleges those earlier events because they reveal the pattern, method, concealment, and discriminatory character of the later unwaived Rehabilitation Act violations.

Beginning in or around February 2022, Plaintiff's then-supervisor, Smita Patel, initiated medical inquiries in connection with Plaintiff's illness-related absences even though no reasonable-accommodation request, fitness-for-duty process, or authorized medical review was pending. On February 9, 2022, Patel asked Plaintiff whether his doctors had "pinpoint[ed] anything" and referred specifically to his medical appointments. Plaintiff understood the inquiry as intrusive and inappropriate, but had no objective basis at that time to conclude it reflected

disability-based scrutiny. However, it marked the beginning of OSC scrutiny of Plaintiff's medical condition and dissatisfaction with the time required for medical care (Exhibit I).

Near the end of May 2022, Plaintiff informed Patel that he would need to use sick leave on June 1 because of illness. Patel reacted angrily and stated that the leave would not be approved because Plaintiff had used sick leave approximately three to four weeks earlier, without citing any leave-abuse policy, prior warning, or certification requirement. Concerned that lawful sick leave was being treated as misconduct, Plaintiff contacted Human Resources, which informed him that OSC followed OPM leave regulations and identified no separate OSC policy requiring advance approval under those circumstances. Plaintiff relayed that information to Patel and resubmitted the request, but received no further response. On June 2, after continued hostile exchanges regarding his illness-related leave, Plaintiff accused Patel of harassment based on her treatment of his medical absences.

After the pay period closed, Plaintiff's official time-and-attendance record was altered to replace the June 1 illness-related sick leave with an AWOL designation, despite the absence of any notification, formal leave-abuse determination, written directive, or medical-certification demand. Later-produced documentation showed that this change was directed and implemented by Susan Ullman and Amy Beckett, neither of whom had supervisory authority over Plaintiff. The change was not disclosed to Plaintiff at the time and was not reasonably discoverable when made. Once later revealed, it showed that Plaintiff's illness-related leave had been converted into an official record implying misconduct through a concealed process outside the ordinary supervisory chain.

8

**C. Governing Agency Policies in Effect During the Events Described in Complaint**

The following agency directives and published procedures were in effect at the time of the events described in this Complaint. These policies establish the governing framework for reasonable-accommodation decision-making, the handling and disclosure of disability-related medical information, performance administration, and the reporting and investigation of workplace misconduct. The policies are included here to provide the institutional context for the events described in the sections that follow, which explain how the actions taken in response to Plaintiff's disability-related requests and leave usage departed from those established procedures.

These directives establish the role-based decision-making structure, the sequence in which actions were to occur, the permissible and impermissible grounds for accommodation denial, the required reporting channels for harassment, the notice and counseling obligations tied to performance evaluation, and the controlled handling of disability-related information. They provide the operational context within which Plaintiff's accommodation request, performance processing, and harassment report were handled.

These policies are relevant because departures from established, neutral procedures may serve as evidence of discriminatory intent, retaliatory motive, interference, or pretext under the Rehabilitation Act. Plaintiff does not assert any standalone private right of action under the Rehabilitation Act to enforce the policies themselves, but instead relies on Defendant's departures from them as evidence supporting the legal violations alleged in this Complaint.

**1. OSC Directive 52 – Reasonable Accommodation Procedures, Decision Structure,**

**Permissible Denial Grounds, and Confidentiality Controls (Exhibit A)**

At the time of Plaintiff's accommodation request, OSC Directive 52 governed the agency's internal processing of reasonable accommodation requests.

9

## A. Disability Determination and Decision-Maker Structure

Directive 52 assigns exclusive responsibility for determining whether an employee is a qualified individual with a disability to the Medical Review Officer ("MRO"). The MRO evaluates medical documentation and determines whether the employee meets the definition of a qualifying disability. The supervisor does not determine disability status.

Once disability status is determined, the supervisor is identified as the decision-maker responsible for selecting the accommodation to be provided. The directive describes the process as interactive and requires communication between the requestor and the decision-maker throughout the accommodation process, particularly when limitations are unclear or when alternative accommodations are being considered. The Disability Program Manager ("DPM") may assist in the process.

## B. Permissible Grounds for Denial

Directive 52 enumerates the permissible bases for denying a requested accommodation. These include:

1. The requested accommodation would impose an undue hardship on agency operations.

2. Medical documentation is insufficient to establish a qualifying disability.

3. The requested accommodation would remove an essential function of the position.

4. The requested accommodation would lower a performance or production standard.

5. The requested accommodation would be ineffective and no reasonable alternative exists.

6. The employee refuses to accept an effective alternative accommodation.

Directive 52 further specifies that certain rationales are not permissible bases for denial. An accommodation may not be denied:

- Because of bias against the employee or the accommodation process.

10

- Because the accommodation requires an exception to existing agency policy.

- Because non-disabled employees are not granted the same privilege or benefit.

## C. Confidentiality and "Need-to-Know" Limitations

Directive 52 requires that all medical information obtained in connection with a reasonable accommodation request be treated as confidential medical information.

Such information may be disclosed only to:

- Supervisors who need to know about necessary work restrictions or accommodations;

- First aid or safety personnel, when appropriate;

- Government officials investigating compliance;

- Workers' compensation or insurance entities, where applicable;

- The EEO Office for reporting purposes.

Individuals disclosing accommodation-related medical information must inform recipients of confidentiality obligations. After a decision is made, the DPM becomes custodian of records created or obtained during processing, and officials who have obtained such information must submit documentation to the DPM and retain no copies. Records are to be maintained consistent with the Privacy Act and 29 C.F.R. § 1614.203(d)(8).

### 2. OSC Directive 58 – Anti-Harassment Policy, Definition of Harassment, and Reporting Obligations (Exhibit AK)

Directive 58 governs OSC's anti-harassment policy and procedures.

## A. Definition of Harassment

Directive 58 defines harassment as unwelcome conduct based on protected characteristics (including disability) that is sufficiently severe or pervasive to alter the conditions of employment and create a hostile or abusive working environment. The definition includes verbal,

11

written, or physical conduct and encompasses conduct that interferes with work performance or creates an intimidating, hostile, or offensive work environment. The directive recognizes harassment as distinct from formal EEO complaints and provides an internal mechanism for addressing alleged harassment.

Directive 58 provides that an employee who believes they have been subjected to harassment should report the conduct. Reporting channels include:

- The employee's supervisor;
- Any management official;
- The Office of Human Capital;
- The EEO Office; or
- Other designated agency officials identified in the directive.

The directive allows reporting outside the supervisory chain if the supervisor is implicated.

Directive 58 requires that any supervisor or management official who receives a report of harassment must promptly act on the complaint. This includes:

- Taking immediate steps to ensure the matter is addressed;
- Notifying appropriate officials designated to handle harassment complaints;
- Ensuring that the complaint is processed in accordance with the directive's procedures.

The directive does not permit supervisors to ignore or informally resolve complaints without appropriate reporting. Management officials have an obligation to elevate the complaint through the designated anti-harassment process.

### 3. OSC Directive 202 – Performance Management Program (Exhibit AP)

Directive 202 establishes OSC's performance management process as an agency-wide system intended to align employee performance with agency goals through an interactive process

between employees and their managers or supervisors. It provides that all covered employees must have a performance plan incorporating the appropriate competency framework for the position, and that the specific language of the critical elements for an individual employee's plan is to be developed by the manager or supervisor. (Directive 202 § A.1.)

Directive 202 further provides that a performance plan must be given to each employee within 90 days after the employee enters a new position. It states that final authority and responsibility for establishing performance plans rests with the appropriate reviewing official where one exists, or with the supervisor if there is no reviewing official. It also requires that each employee performance plan be in writing, reviewed and approved by the reviewing official where one exists, and normally communicated to the employee before, or within 30 days after, the beginning of the appraisal period or other period for which performance will be reviewed. (Directive 202 § A.2.)

Directive 202 also provides that if a performance plan is changed during the appraisal period, the employee may be evaluated on the new elements and standards only prospectively, and that changes to elements or standards do not become effective until reviewed and approved by the appropriate reviewing official. (Directive 202 §§ A.4, A.5.)

Directive 202 imposes specific responsibilities on supervisory officials in administering the performance process. It provides that supervisors shall keep employees advised of the level of their performance and shall conduct a formal mid-year progress review by the end of November. It also states that appraisal input sources will consist of the supervisor's input and may include self-assessments by the employee and, where appropriate, information concerning performance during details. (Directive 202 §§ B.4, B.5.)

13

Directive 202 also provides that if, at any point during or at the end of an appraisal period, an employee is determined to be performing at less than the Acceptable level on a critical element or overall performance, the employee must be counseled by the initial appraising official regarding the noted deficiencies and advised of the steps required to improve to the Acceptable level. (Directive 202 § D.1.)

### 4. OSC–4 System of Records Notice – Structured Handling of Accommodation-Related Medical Information Within the Rehabilitation Framework

At the time Plaintiff's reasonable accommodation request was pending, OSC maintained a published System of Records Notice entitled "OSC–4, Reasonable Accommodation Records," 85 Fed. Reg. 39184 (June 30, 2020). OSC–4 defines how accommodation-related medical information is collected, stored, accessed, and disclosed within the agency's reasonable accommodation process.

OSC–4 identifies the purpose of the system as processing, evaluating, and deciding reasonable accommodation requests and tracking compliance with federal disability law. The system covers records created or received in connection with requests for reasonable accommodation, including medical documentation and related communications. OSC–4 designates system managers responsible for maintaining the records and specifies that accommodation-related information is maintained within controlled systems. Access is limited to personnel with an official need to perform accommodation-related duties. The notice identifies categories of individuals who may access such records in connection with disability determination and accommodation evaluation functions.

The structure described in OSC–4 aligns with the role-based allocation established in Directive 52. Disability determination is performed by the Medical Review Officer;

14

accommodation selection is made by the designated decision-maker; and the Disability Program Manager serves as custodian of accommodation records after processing. OSC–4 reflects a framework in which accommodation-related medical submissions are handled within a defined decision-making channel and segregated from general personnel, performance, or disciplinary processing. OSC–4 also enumerates routine uses under which accommodation-related information may be disclosed, limiting disclosure to defined operational purposes. The system description does not identify general executive circulation or unrestricted internal distribution as part of the accommodation-processing structure. Rather, it contemplates controlled disclosure confined to those performing disability determination, accommodation evaluation, implementation of work restrictions, or compliance oversight.

Thus, at the time Plaintiff's disability was confirmed and his reasonable accommodation request for full-time telework remained pending, accommodation-related medical documentation was governed by a published framework that defined: (1) the purpose of collection; (2) the designated custodians; (3) the categories of individuals with authorized access; and (4) the operational scope of permissible internal handling within the accommodation process.

**5. COVID Workplace Safety Plan and In-Office Requirements (Exhibit AF)**

In October 2022, OSC's updated COVID-19 Workplace Safety Plan stated that all Headquarters employees were required to report in person two days per week—Wednesday and either Tuesday or Thursday in consultation with a supervisor (Exhibit AF). The plan further instructed employees not to come into the office when sick and expressly recognized that employees could telework from home or take leave when ill. The plan also directed employees seeking disability-based adjustments to follow Directive 52's reasonable accommodation procedures. Notwithstanding that agency-wide baseline of two in-office days, Plaintiff was

15

directed beginning September 9, 2022 to report four days per week, was told he could not telework during flare-related illness, creating a divergence between the published workplace framework and the individualized restrictions imposed during the pendency of his accommodation request.

### D. August – November 7, 2022: RA Denials, Denial, Undocumented "Probation," and Immediate Escalation of Disability-Linked Restrictions

Prior to the enforcement of an alleged probation, internal executive communications established a negative characterization of Plaintiff that preceded any written probationary or performance framework. On August 22, 2022 (Exhibit AM), COO Bruce Gipe relayed to senior legal advisor Nicole Brightbill that Ahmad had described Plaintiff as "a bit lazy" and stated he was "not a fan" of Plaintiff, while separately noting positive feedback on the eCMS system Plaintiff was managing. No probationary framework and no performance concern appeared anywhere in that August 22 communication. The negative personal assessment was documented at the executive level seventeen days before Ahmad directed Hall to impose the four-day in-office mandate on probationary grounds.

In August 2022, Plaintiff experienced aflare-up due to his disease and informed his management generally and additional and often unscheduled telework and sick leave use was approved. Plaintiff noticed that his treatment by his management became colder and less friendly shortly after. In early September 2022, immediately following Plaintiff's use of disability-related sick leave associated with flare activity, his attendance and reporting obligations became the subject of heightened internal scrutiny within OSC leadership. At that time Plaintiff remained subject to the agency's standard hybrid work schedule requiring in-office presence on Tuesdays and Wednesdays. No written probation notice, performance restriction, or revised performance

16

standards had been issued, and Plaintiff had not been informed that his employment status differed from that of other staff.

In August 2022, before any Plaintiff's compulsory in-office attendance requirement had been imposed, Plaintiff informed his supervisor, Vance Hall, that he suffered from a recurring skin condition that could unpredictably affect his attendance. Plaintiff described the condition only generally at that time and did not provide detailed medical information.

On September 8, 2022, Chief Information Officer Ammar Ahmad directed Hall to impose a compulsory, 4-day in-office attendance based on an asserted probationary status, writing: "Since Nathan is on probation he is required to be in the office every day. Starting next week please ask him to come to the office." (Exhibits L, U). Plaintiff had not been notified that he was on probation, had not received any probation memorandum, and had not been provided written performance standards tied to any probationary or extended performance status.

The following day Hall implemented the attendance change but conveyed a different and more benign explanation to Plaintiff. On September 9 Hall wrote: "Due to the shortage in helpdesk coverage and other circumstances, we are going to require you to come into the office Monday through Thursday until further notice. I also added helpdesk permissions to your admin account." (Exhibit U). Hall's explanation cited staffing needs and "other circumstances," not probation, and suggested the change was operational rather than disciplinary.

Hall and Ahmad later testified in sworn statements that the four-day in-office attendance requirement was imposed because they believed Plaintiff had abused sick leave. Plaintiff was never informed that this suspicion was the asserted basis for the restriction, was never given an opportunity to challenge it, was never allowed to provide medical support or other information addressing the leave usage the agency was treating as abusive, and no investigation occurred

17

before punitive action taken. Instead, even as the agency took concrete employment actions against Plaintiff based on that undisclosed premise, it concealed the real rationale behind shifting and inconsistent explanations, first attributing the requirement to a staffing shortage, then to a policy change, then to probation, and later to an "extended period of performance." Although the requirement was thus justified internally as a response to Plaintiff's supposed sick leave abuse, it did not regulate or limit the use of sick leave itself. Rather, it imposed a workplace restriction after Plaintiff had used medically necessary sick leave. Similar restrictions followed in the weeks that followed and were likewise due to Plaintiff's use of sick leave and exercise of disability-related rights (Exhibits AA, AB).

Within days, it became apparent that the four-day compulsory in-office attendance was not being applied across the IT staff. When Plaintiff arrived at the office on September 12, he observed that no other IT personnel were present and asked Hall whether the schedule change had begun that day. Hall responded: "Everyone's new schedule starts this week, but you are the only in the office today." At the time, Hall only informed Plaintiff that the increased in-office attendance restriction was part of a broader schedule change affecting IT staff and was necessary due to helpdesk operational needs (Exhibit W). Plaintiff subsequently confirmed with other IT staff members on September 14 that their schedules had not changed and that they had not been directed to report in person four days per week. In later sworn statements, both Hall and Chief Information Officer Ammar Ahmad acknowledged that the four-day in-office attendance requirement applied only to Plaintiff. (Exhibit AA).

Shortly after the four-day in-office attendance requirement was imposed, Plaintiff's attendance became the subject of much internal discussion following an absence for which Plaintiff had emailed Hall that he was taking sick leave. Massey, Baxter, Brightbill, Ullman, and

18

Beckett all participated and almost all of them were agency executives at the time. For the first time since Plaintiff joined the agency, Plaintiff's emailed sick-leave notice was blocked by the agency's email filtering system. This had not occurred at the agency prior to internal claims of leave abuse and probation. Rather than being addressed as a routine supervisory matter between Plaintiff and Hall, the absence became the subject of many internal emails and discussions among multiple agency executives. After the notice was confirmed, the internal discussion shifted to characterizing Plaintiff's approved leave as a "frequent pattern," while the four-day in-office attendance requirement remained in effect. Ahmad wrote in response to a suggestion from Beckett: "Good point! There is definitely a pattern of frequent sick leave requests from him." (Exhibit AS). No leave audit or medical certification of leave requirement was implemented until October 27 despite the claims of leave abuse. Plaintiff still was never informed of this suspicion/presumption while employed at the agency, a suspicion/presumption that had led the agency to implement multiple restrictions before verifying it.

During this same period, Plaintiff initiated the reasonable-accommodation process (Exhibit AT). On September 12, 2022, Plaintiff informed his supervisor, Vance Hall, of his medical condition in greater detail and explained that he would be requesting a reasonable accommodation. Plaintiff informed Hall that he experienced episodic flare-ups associated with a chronic inflammatory skin disorder that made higher in-office attendance medically difficult during active episodes. Hall later acknowledged that Chief Information Officer Ammar Ahmad asked him what the condition was and that, after learning additional details from Plaintiff, he relayed that information to Ahmad. (Exhibit AB). By mid-September, Hall, Massey, and Ahmad were aware that Plaintiff's attendance limitations were connected to an ongoing medical

19

condition before the accommodation process formally advanced and before the agency evaluated the medical documentation that was later submitted.

On September 21, 2022, Plaintiff submitted additional medical information for accommodation seeking fulltime medical telework (Exhibit AT). The request was directed to Human Capital Chief Leigh Ann Massey, who served as the agency's Disability Program Manager responsible for coordinating accommodation requests. Following this submission, Ahmad stopped speaking directly with Plaintiff unless Hall was present. At this time Plaintiff began to observe marked changes in how he was treated within the agency: OSC staff who had previously interacted with him stopped speaking to him, requests for information or routine IT coordination were sometimes ignored, and the Special Counsel, Henry Kerner, personally approached Plaintiff to say hello and already knew Plaintiff's name despite Plaintiff holding a non-executive technical position and that they had never interacted. Other IT staff who witnessed the encounter told Plaintiff they had never experienced similar treatment and had not seen the Special Counsel personally approach or single out an IT employee in that manner. Ahmad would later (in early October) force Plaintiff to work unpaid overtime as well for around 6 hours.

On September 21, 2022, Ahmad contacted Massey seeking details regarding Plaintiff's reasonable-accommodation request and stated that Plaintiff appeared to be using the accommodation process to circumvent what Ahmad described as a sick-leave–related probation (Exhibit J). Ahmad explained that he had learned of the request from Plaintiff's supervisor, Vance Hall. Massey responded by providing confidential information concerning Plaintiff's accommodation request. Plaintiff had disclosed the request and associated medical information only to Hall and to Massey as the agency's Disability Program Manager. During the email exchange Massey asked Ahmad whether Plaintiff had informed him of the accommodation

20

request directly. Ahmad confirmed that Plaintiff had not and that he had learned of the request through Hall.

While the accommodation request was underway, senior leadership and legal advisors began discussing Plaintiff's performance status and the asserted probationary designation even though the governing performance standards had not been identified or supplied. On September 23, Ahmad wrote to Massey stating: "Nicole wants me discuss some options related to Nathan performance and probationary period." (Exhibit v). The reference was to Nicole Brightbill, the Senior Legal Advisor to the Special Counsel. Executive leadership participated in discussions concerning Plaintiff's alleged probationary status and potential performance actions even though that status had never been documented through any formal performance process, and those discussions began almost immediately after Plaintiff submitted full medical documentation in support of his reasonable-accommodation request and the agency accepted that documentation. These discussions reflect that multiple senior officials were aware of the purported probation, despite later statements suggesting the designation resulted from a misunderstanding limited to Ahmad.

On September 26, Plaintiff reported a flare-up of his medical condition and requested situational telework for that day. Hall approved the request without seeking clarification regarding the condition or requesting additional medical documentation. Plaintiff wrote: "Hi Vance, I'm having a flare-up this morning, so I need to telework today to avoid calling out sick." During the same exchange, Plaintiff informed Hall that he would be accessing an employee mailbox to locate information concerning a contractor related to the public OSC website. Accessing user mailboxes for agency information and technical support was part of Plaintiff's IT administrative duties, and as the agency's email administrator Plaintiff already had the technical

21

ability and authorization to access user mailboxes when necessary. Hall responded: "That is fine for today." (Exhibit X). The next day, Hall informed Plaintiff that Ahmad had prohibited situational telework and that Plaintiff would be required to take sick leave whenever flare-ups occurred.

In a meeting around September 27 with Ahmad and Hall, Ahmad stated for the first time directly to Plaintiff that Plaintiff was on probation. Plaintiff began questioning the basis for this assertion immediately and asked Ahmad to explain the designation. Ahmad did not and would not respond to questions regarding the probation in writing, did not reference his earlier statements to Hall, and frequently required that the probation and its related workplace restrictions be discussed in Microsoft Teams phone calls with Hall present.

During this same period (September 9–29), Plaintiff's job responsibilities expanded while the compulsory in-office attendance restriction remained in effect. Beginning September 9—the same day the four-day attendance mandate was implemented—Hall informed Plaintiff that helpdesk permissions had been added to his administrative account. (Exhibit U). Plaintiff was also assigned responsibilities involving server administration, enterprise system continuity, OSC.gov website management, and coordination with IT contractors. Other restrictions included remedial training, forced unpaid overtime, a bar to situational telework and a requirement to use sick leave when a flare-up occurred, these expanded technical duties were assigned during the same period in which agency officials were internally characterizing Plaintiff's leave usage as problematic and discussing his purported probationary status. No written performance plan or updated performance elements were issued before these responsibilities were assigned. The events surrounding the administration of Plaintiff's performance plan during this period are described in detail in the performance section of this Complaint. During the accommodation

22

process, Defendant also interfered with Plaintiff's ability to perform his duties generally. This includes removing permissions around 27 that were required to perform Plaintiffs system admin duties and failing to grant permissions to allow for Plaintiff to perform the newly assigned OSC.gov management between late August-October 28, but stating that it would rate him on those duties nonetheless.

On October 4, Ahmad internally confirmed that Plaintiff was not on probation. In an email to Amy Beckett and Human Capital Chief Leigh Ann Massey, Ahmad wrote: "FYSA – Nathan is not on probationary period as Amy has confirmed." (Exhibit AR). The October 4 exchange did not reference any "extended period of performance" or similar status governing Plaintiff's employment. Nine days later, however, Ahmad wrote internally that he was "reconfirming with Leigh Ann that he is not on probation rather extended period of performance." (Exhibits T, AR). The record reflects that once the probation issue had been resolved by October 4, the agency did not correct Plaintiff's status, inform Plaintiff of that resolution, or remove the restrictions that had been imposed under the probation label. Instead, those restrictions remained in effect while agency officials substituted new terminology for Plaintiff's status. Around October 13, agency officials adopted a different and still unsupported characterization. On October 17, Ahmad told Plaintiff was told both that he was not on probation and that the status had supposedly been set up by Smita Patel in September 2021 (Exhibit J). That explanation did not provide an independent basis for the restrictions. Hall and Ahmad later testified that the probation and related restrictions were based on Plaintiff's then-current attendance or sick-leave patterns, not on any preexisting status from 2021, and Patel had left OSC in June 2022 before the September 2022 sudden and supposed continuation of those restrictions. The sequence therefore supports the inference that once the probation rationale

23

could no longer be used to maintain the restrictions, the agency adopted new and equally unsupported terminology to continue them under a different label.

In mid-October, Plaintiff took about a week of annual leave from the agency, hoping that his stress would decrease and the disease would go into remission once more. But when he returned to the agency his treatment was unchanged which only further exacerbated his flare-ups.

On October 14, 2022, Massey confirmed that Plaintiff's medical documentation established that he was a qualified individual with a disability. (Exhibit AI.) Five days later, on October 19, 2022, Massey wrote to Ahmad and Hall that Plaintiff's reasonable-accommodation request was attached and stated that, under Directive 52, "the immediate supervisor is the deciding authority for these requests," while she, in her role as Human Capital Chief and reviewer of the medical documentation, had determined that Plaintiff's submission was sufficient to establish a qualifying disability (Exhibit AC). The attached request consisted of Plaintiff's email seeking permanent full-time telework together with the supporting medical documentation.

Despite invoking Directive 52's rule that the immediate supervisor was the deciding authority, Massey's October 19 email did not reflect any independent decision by Hall. Instead, Massey stated that the documentation had been reviewed "in consultation with OGC" and that the "supported accommodations would be access to a private washroom to treat his medical condition and/or authorized unscheduled leave when a flare up occurs." (Exhibit F; Exhibit AJ) She further wrote that "[t]he documentation did not specify how telework supports his ability to perform the essential duties of his position." That statement was inaccurate. Plaintiff's medical submission explained the nature of his condition, the unpredictable flare-ups, and why telework was necessary to permit him to continue working during those episodes rather than being forced to take leave.

By October 19, Massey had already rejected the requested accommodation in substance, endorsed alternative accommodations that Plaintiff had not requested, and had done so through consultation with OGC rather than through the immediate supervisor whom she simultaneously identified as the agency's decision-maker under Directive 52. The same email also reflects that Plaintiff's confidential accommodation request and supporting medical documentation had been transmitted beyond Hall to Ahmad and to agency counsel in OGC, later identified as Susan Ullman and Amy Beckett. The material had been circulated outside Plaintiff's immediate supervisory chain and beyond the limited policy-based channels for reasonable-accommodation review, into a broader management-and-counsel circulation that fell outside the accommodation process.

Ahmad forwarded Massey's email containing confidential medical information and attachments (Exhibit F) to agency executives Karl Kammann and Kimberley Baxter with the notation "FYSA." Kammann responded, "Jeez…". Baxter then replied to Ahmad and Kammann and set out what Ahmad could communicate to Plaintiff: that all staff were required to be in the office two days per week, that OSC could provide access to a private restroom, and that OSC could approve unscheduled leave when a flare-up occurred. Baxter also asked whether Plaintiff would need to provide a doctor's note for flare-related leave. Massey later confirmed in sworn testimony that she had conferred with OGC officials involved as Susan Ullman and Amy Beckett (Exhibit AO). The October 19 communication did not include a documented essential-function analysis identifying duties requiring full-time in-office presence and did not reference any written undue-hardship assessment. Other discussions of a potential accommodation did not include those analyses either.

On the morning of October 27, Plaintiff informed Hall he believed Ahmad's actions to be harassment, retaliation, and discrimination (Exhibit W) which Directive 58 required him to report. Plaintiff also filed a complaint with the OSC EEO. Hall informed Plaintiff of no action though he later said he forwarded it to Ahmad.

Also, on October 27, Ahmad restored Plaintiff to the agency's standard hybrid two-day in-office attendance schedule used for OSC staff, ending the previously imposed four-day in-person attendance requirement. (Exhibit U). Later that same day Ahmad called Plaintiff and informed him that his request for full-time telework had been denied. During that call Ahmad provided no explanation for the denial. When Plaintiff, concerned that he might otherwise receive no accommodation at all, suggested a four-day telework arrangement during the call, Ahmad immediately rejected that proposal as well. He also stated that the agency was only able to provide the baseline schedule.

Ahmad subsequently sent the written accommodation decision on October 27 at 7:45pm confirming the discussion we had that afternoon. The decision denied Plaintiff's request for full-time telework and stated: "I understand that your preferred accommodation is full-time telework; however, the following option listed below is a reasonable accommodation for your condition. You will be required to be in the office two days/week (Every Tuesday & Every Wednesday) and will work remotely the remaining 3 days/week. This accommodation will be in effect for the next six (6) months at which time ITO will re-evaluate your request." (Exhibit S). This email was

This decision matched what Baxter told Ahmad to present to Plaintiff (Exhibit F) on October 19 and presented the agency's existing hybrid schedule as the accommodation outcome after Plaintiff had already been returned to that same schedule earlier on October 27 at 8:20am before being presented with the decision (Exhibit Y). The decision did not identify any

26

individualized operational constraint requiring the earlier four-day in-office attendance mandate, did not attach an essential-function analysis, did not reference a written undue-hardship determination, and did not explain why full-time telework could not be provided.

Moreover, October 26 and 27 marked the point at which multiple employment actions were advanced simultaneously against Plaintiff. Multiple measures affecting Plaintiff's employment status were being developed in parallel and were implemented and/or revealed to Plaintiff at the same time the agency denied his accommodation request. In context, that convergence supports the inference that the actions were coordinated and deliberately timed as part of a planned escalation rather than occurring independently. On October 27, Plaintiff was informed for the first time that the asserted extended performance period would end on October 31 (Exhibit AA). He had not been provided finalized, discussed, or signed written performance standards or governing dates.  Also, Ahmad informed Hall that to begin writing the performance plan and standards by which Plaintiff would be rated on November 1 (Exhibit N). On October 26, Hall informed Plaintiff that he would be required to provide doctor's notes for all sick leave (despite having a now qualified disability), later referencing Plaintiff's "history of calling out sick." (Exhibit AA). This was the first explicit per-absence medical-certification requirement imposed during the September–October period, and it was not preceded by any written or verbal leave restriction or abuse discussion/accusation of any kind.

On October 28, Plaintiff responded that he would comply with the certification procedures established by the Office of Personnel Management and cited the governing regulatory framework (Exhibit AL). Following Plaintiff's invocation of those standards, the per-absence doctor's-note requirement was immediately withdrawn. The certification demand had arisen after weeks of internal discussion describing Plaintiff's approved sick leave as a "frequent

27

pattern," even though Plaintiff's sick leave during that period had been entered and approved in the agency's official timekeeping system and did not show an excessive amount of leave.

By late October and early November 2022, Plaintiff's reasonable-accommodation request was no longer being handled as a discrete medical determination. Internal communications show that leave scrutiny, accommodation drafting, and performance processing were advancing simultaneously and being coordinated within the same chain of review, including officials outside Plaintiff's supervisory chain. During this period, agency officials requested detailed information regarding Plaintiff's sick-leave usage and compiled leave-tracking summaries outside the agency's official timekeeping system, even though the underlying leave entries had been coded and approved in the agency's time records. Internal emails reflect that these matters were being addressed together. In a October 27–28 email chain, officials discussed both the accommodation decision and the extended performance period, noting that the accommodation determination had been established and that Plaintiff's evaluation period would conclude on October 31 (Exhibit H).

Following Plaintiff's October 27, 2022 EEO complaint, Ahmad and agency counsel Amy Beckett met with representatives of the Equal Employment Opportunity office. During that meeting Ahmad stated that if Plaintiff should have come to him informally to have the issue resolved despite stating that all that could be offered was the baseline employee schedule that he had restored before the offer.

The contemporaneous record reflects that Plaintiff had already raised the accommodation issue directly with Ahmad at the time the decision was issued. On October 27, Ahmad called Plaintiff and informed him that the request for full-time telework had been denied. Later that same day Ahmad transmitted the written denial. After receiving the email, Plaintiff replied and

28

asked whether the baseline hybrid schedule described in the decision was the full extent of the accommodation the agency was willing to provide. Ahmad did not respond to that inquiry.

At the time of these communications Ahmad was already participating in the accommodation process and had received Plaintiff's written request and medical documentation through the agency's Human Capital Chief, Leigh Ann Massey. Internal communications show that the accommodation language had been circulated among multiple officials, including agency counsel, prior to the issuance of the written decision. See Exhibit F.

On November 7, 2022 Ahmad issued the completed Form OSC-61 denying Plaintiff's request for full-time telework for the second time. (Exhibit AD). The email stated that the request "cannot be approved at this time" and would be re-evaluated in six months. That same day Ahmad informed agency counsel that he had made "two RA offers" and described the arrangement as a "negotiated/agreed accommodation" (Exhibit AG). On October 31, Ahmad circulated for Beckett's approval a draft response advancing the accommodation she had selected: use of two bathrooms, neither of which included a shower. Although the agency ultimately did not adopt that specific option, the draft shows that Beckett, not Hall nor Ahmad acting independently, was driving the accommodation process.

Performance processing advanced simultaneously. On November 7, draft performance appraisal materials circulated internally with instructions that they not yet be shared with Plaintiff (Exhibit H) and at no point were they shared. Internal communications acknowledged that the evaluation still required sharing and signature, yet performance conclusions were being advanced. (Exhibit AE). The extended performance endpoint had been fixed for October 31, the second accommodation denial issued November 7, and performance materials circulated internally the same day.

29

By late October and mid-November 2022, the record shows that Plaintiff's accommodation request was not being handled through a neutral, individualized interactive process, but through a lawyer-reviewed and management-controlled process that repackaged denial as accommodation. On October 31, Ahmad sent Beckett and Massey a completed draft Form 61 and a draft email to Plaintiff, stating that he would communicate the decision only after Beckett approved the email content and Form 61 and asking whether the form should accompany his email. In that same draft, Defendant framed full-time telework as denied because an alternate accommodation was supposedly available in the building. Beckett had already told Ahmad that he needed to complete Form 61 to document the "denial/offer of alternate Reasonable Accommodation." On November 3, Ahmad then sent Beckett and Massey a filled-out draft Form 61, stated that he and Hall had consulted and that Hall was "ok with the revised offer," and asked when he or Hall could communicate it to Plaintiff, while separately forwarding the material to Hall with instructions not to discuss or share it. The final November 7 email then told Plaintiff that full-time telework could not be approved "at this time," referred him to the attached Form 61 for the reason for denial, and presented the agency's proposal as the accommodation that would remain in effect for six months. These communications support the inference that the second denial was scripted, revised, and managed through counsel, Human Capital, and leadership before being sent to Plaintiff, rather than resulting from a genuine interactive process aimed at identifying an effective accommodation. Exhibits K, P, AI, AD.



The record also shows that Defendant later attempted to manage the history of that same process after the fact by characterizing prior communications as accommodation "offers." On November 15, 2022, after Plaintiff had already been denied full-time telework and placed on investigative leave, Beckett asked Ahmad when he had submitted the Form 61 for the supposed "negotiated/agreed accommodation" of four days of telework. Ahmad replied that the relevant date was November 7 and added that "the first offer was sent to him on October 27." That exchange is significant because it shows counsel and management retrospectively framing the agency's actions as accommodation "offers," even though Defendant had not granted Plaintiff's requested full-time telework and was instead attempting to characterize earlier communications as if they reflected an agreed accommodation outcome. In context, the November 15 exchange

31

further supports the inference that Defendant was managing the record of the accommodation process through counsel and leadership after the fact rather than neutrally documenting a genuine interactive process. (Exhibit K)

These actions did not unfold as separate administrative determinations following independent review. The documentary record shows that leave scrutiny, accommodation drafting, and performance processing advanced simultaneously during the final days of October and the first week of November 2022 and were handled by the same executive officials. This convergence occurred immediately after Human Capital confirmed Plaintiff's disability on October 14 (Exhibit AO). Sworn testimony later confirmed that the escalation of Plaintiff's compulsory in-office attendance was tied to attendance concerns rather than any essential in-person duty. Hall explained that the four-day compulsory in-office attendance began when Plaintiff "would notify us… he was having a flare up" and that the increased compulsory in-office attendance "was the start of the progression of what was occurring." (Exhibits AA, AB).

During the final days of October and the first week of November 2022, Plaintiff therefore faced heightened in-office compulsory in-office attendance requirement, individualized monitoring of disability-related leave, performance processing tied to a retroactively defined evaluation period, and formal denial of the requested accommodation. These measures unfolded together within the same narrow timeframe and were advanced by the same group of officials during the same decision-making process.

### E. Escalating and Irregular Performance Actions During Active Disability and Accommodation Processing

As of early September 2022, Plaintiff's official personnel records reflected satisfactory performance. On September 11, 2022, Plaintiff's Standard Form-50 recorded that his

32

performance was "at an acceptable level of competence," and Plaintiff received a within-grade step increase. No written performance warning had been issued, no performance improvement process had been initiated, and no document reflected deficient performance. The unusually intensive performance-related restrictions and evaluation activity that followed did not emerge from an ordinary, preexisting supervisor-led process. They arose only after Plaintiff began using disability-related sick leave, objected to the resulting restrictions, and sought accommodation for hidradenitis suppurativa.

The initial escalation began immediately after Plaintiff used disability-related sick leave that began in August. On September 8, 2022, Ammar Ahmad instructed Vance Hall: "Since Nathan is on probation he is required to be in the office every day. Starting next week please ask him to come to the office." The next day, Hall told Plaintiff (Exhibit Y): "Due to the shortage in helpdesk coverage and other circumstances, we are going to require you to come into the office Monday through Thursday until further notice." A few days later, when Plaintiff observed that no one else had actually been brought in under the supposed schedule change, Hall confirmed: "Everyone's new schedule starts this week, but you are the only in the office today." These communications show that the initial in-office restriction imposed on Plaintiff was not a neutral application of a generally enforced office policy. It was a unique restriction tied by Ahmad to an undocumented "probation" status that appeared only after Plaintiff's disability-related leave use. The agency's own later testimony (Exhibit AA) tied that escalation to Plaintiff's leave use. In his sworn EEOC statement, Hall explained that Plaintiff was asked to be in the office four days a week, that the primary reason was his attendance, and that this was the start of the progression of what was occurring. He specifically did not mention an probation, an extended period of

33

performance, a policy change, nor a staff shortage as had been told to Plaintiff while employed at the agency.

Hall further explained that when Plaintiff notified management he could not report in person on mandatory days because of flare-ups, he was told he could not work from home on those days and instead would have to use leave. Hall's statement is important because it directly links the four-day in-office requirement to the agency's reaction to Plaintiff's flare-related absences and identifies that requirement as the beginning of a broader escalation. Thus, the record does not merely show temporal overlap between disability-related leave and later performance measures. It shows that attendance concerns generated by disability-related flare-ups were treated as the basis for the initial escalation from which the later restrictions and performance activity developed.

Internal executive communications from the same period reinforce that link. On September 14, 2022 (Exhibit AS), after questions arose concerning Plaintiff's sick leave, Ahmad wrote to Amy Beckett and Kimberley Baxter: "Good point! There is definitely a pattern of frequent sick leave requests from him." That message is significant because it shows that disability-related leave was not being treated as an ordinary medical matter. It was being internally characterized as a "pattern" meriting scrutiny by senior officials before the later performance structuring took shape. This immediately followed the collapse of another negative attendance claim that was unsupported. Once Plaintiff's leave was cast in that manner, the agency did not merely question attendance. It imposed a special status label, increased restrictions, and began building a more formal evaluative structure around him. The probation narrative itself was developed through executive and Human Capital channels rather than through routine first-line supervision. On September 23, 2022, Ahmad wrote to Human Capital

34

Chief Leigh Ann Massey: "Nicole wants me discuss some options related to Nathan performance and probationary period." Yet Plaintiff had received no written notice placing him on probation, no contemporaneous explanation of what that supposed status meant, and no identified performance standards tied to it. The significance of this exchange is that the probation framing was already circulating among executive officials and Human Capital leadership while Plaintiff's disability-related absences and accommodation activity were ongoing. The process was therefore not a routine supervisory response to known performance deficiencies. It was a higher-level management response that appeared after Plaintiff's disability-related leave use and while the agency was actively discussing how to handle him. At the same time, Plaintiff's attendance obligations intensified in ways that were not shown to have been routine for other employees. Plaintiff was required to work in the office four days per week, submit status information directly to Ahmad, and maintain a customer-interaction matrix.

The record further shows that even after those restrictions were imposed, Human Capital was still trying to determine what standards supposedly governed Plaintiff's performance. On September 26, 2022, Massey asked Ahmad to send "his performance standards and any guidance he's been work expectations." That request came after Plaintiff had already been forced into the office under the probation narrative and after the agency had already begun scrutinizing his flare-related leave. This is highly probative because it shows that the agency imposed restrictions first and sought the underlying performance framework afterward. The process was therefore not a settled or ordinary performance regime that merely happened to coexist with disability processing. It was being assembled in reaction to the same sequence of disability-related leave, objections, and accommodation activity. When Plaintiff challenged the probation designation and sought accommodation, the agency did not withdraw the restrictions or clarify that no such

35

status existed. Instead, it shifted terminology and formalized the scrutiny. On October 13, 2022, after Plaintiff asked Ahmad whether he was actually on probation, Ahmad wrote Massey: "I am going to inform him that he is not on probation rather on extended period of performance which ends by end of this month." The next day Ahmad told Massey: "I think Bruce said he is on 'probation' for 3 months so I guess his performance period ends by end of this month. I really don't know the timeline as I joined in the middle." These exchanges are significant because they show that after Plaintiff questioned the probation framing, management did not point to an already-established performance structure. Instead, officials were still trying to decide what the replacement terminology would be, when the supposed period would end, and whether Plaintiff had even been told of it. That shifting of labels from "probation" to "extended period of performance," after the restrictions had already been imposed, supports the inference that the agency was building a post hoc performance framework around a disability-linked escalation rather than implementing a routine process that predated Plaintiff's leave and accommodation activity. By mid-October, senior officials and agency counsel were still retroactively selecting the dates of Plaintiff's supposed evaluation period.

While Plaintiff's reasonable-accommodation request remained pending, Defendant did not keep performance administration separate from the accommodation process or apply a fixed, preexisting evaluative framework. Instead, the record shows that Human Capital and agency counsel were actively coordinating performance timing and structure during the same period in which Plaintiff's accommodation request was under review. On October 19, 2022, after Defendant had already recognized Plaintiff's qualifying disability, Leigh Ann Massey told Ammar Ahmad that she had spoken with Amy Beckett and Susan Ullman and recommended using July 31, 2022 as the start date, and proposed October 31, 2022 as the endpoint for

36

Plaintiff's annual appraisal. The following day, Massey asked Ahmad whether he wanted to discuss "this and the RA request" and stated that, on the performance side, Amy should be looped in (Exhibit AH). These communications show not only that the performance matter and the accommodation matter were being handled together, but that the agency was still selecting the operative dates of the supposed evaluation period near the end of that very period. That sequence supports the inference that Plaintiff could not have known the asserted evaluative window, standards, or consequences in advance, and that Defendant was using a shifting, lawyer-involved process to build performance-related pressure while Plaintiff was seeking accommodation for disability-related limitations.

The link between disability processing and performance escalation became explicit on October 27, 2022 (Exhibit H). At 4:51 p.m. that day, Massey wrote Ahmad, with Nicole Brightbill and Amy Beckett copied: "Thought it may be helpful to outline the steps we discussed regarding Nathan's extended performance period and reasonable accommodation request to help facilitate the process, as well as meet required timelines." She then addressed both subjects in the same email. In the reasonable accommodation portion, she stated that Plaintiff's medical documentation had been accepted on October 14 and that Ahmad had already established the accommodation to be granted on October 24. In the performance portion, she stated that Plaintiff's original annual performance rating had been rescinded, that July 31 had been established as the start of the ninety-day period, that the period would conclude on October 31, and that the agency needed to determine whether Plaintiff was failing one or more performance elements. This document is not merely evidence of overlap. It shows that the agency was coordinating Plaintiff's accommodation outcome and his negative performance trajectory within the same management process, through the same officials, while his disability-related issues

37

were active. That is powerful evidence that the performance escalation did not develop independently of Plaintiff's disability-related activity. It developed alongside and through it. Ahmad's response that evening confirms that executive officials, not Hall acting alone, were driving the process. Ahmad wrote: "As you, Amy and I discussed on the meeting this week, ITO is making progress as follows; Nathan's extended period of performance ends on October 31st Monday > Vance (his supervisor) will provide me draft performance plan feedback early next week." Ahmad and Beckett had already met that week about Plaintiff's matter, that Hall's role was to provide draft material which had not occurred yet (and it could not have been provided to Plaintiff as is standard since it did not exist), and that Ahmad retained review and approval authority as second-line manager. It also shows that as of the evening of October 27, draft performance-plan-related material was still being assembled and Plaintiff was only then being given an opportunity to provide input, even though the supposed ninety-day period ended on October 31. This was not a routine evaluation effort. It was a top-down process still being assembled at the endpoint of the very period on which the agency intended to judge Plaintiff.

The surrounding October 27 emails (Exhibits N, M) confirm that the process was still being built in real time. At 3:54 p.m., Ahmad instructed Hall: "As discussed please provide (draft) by tomorrow afternoon." At 7:36 p.m., Ahmad then told Plaintiff: "Your extended period of performance ends on October 31st. If you have any input on you performance over this period please provide your input to both Vance and I by November 1st, 2022 by COB." Thus, on the same day Plaintiff was first notified that the period would end on October 31, Ahmad was still directing Hall to produce a draft by the following afternoon. The agency was closing the period while still generating the materials necessary to define and evaluate it. That timing supports the inference that the agency's performance escalation was reactive and post hoc, not routine and

38

prospective. It also occurred on the same day the agency sent its first written accommodation response, further underscoring that performance escalation and accommodation handling were advancing together. The process remained incomplete even after management was already moving toward a negative outcome.

On November 10, 2022, Ahmad sent Massey and Hall an email (Exhibit AE) and asked: "Do performance ratings need to be communicated formally with Nathan and Vance and Nathan needs to sign the performance plan document?" He also asserted that Plaintiff "did not meet 'acceptable' ratings for critical Element 1" and asked how to initiate a PIP. On November 15, Massey replied: "This needs to be finalized on the Performance Appraisal.doc … and be sure to include his signed performance plan as well. The performance rating does need to be formally communicated to Nathan and the annual appraisal needs to be signed by him." These communications confirm that the agency was internally asserting that Plaintiff had failed a critical element while still asking basic questions about formal communication and signatures, and while Human Capital was still instructing Ahmad to include a signed performance plan. That is not the sequence of an ordinary, well-established process. It is evidence of a performance apparatus being improvised and hardened against Plaintiff after the disability-related sequence had already begun. The November 7 draft email to Hall underscores the concealed and nonroutine character of the effort. Ahmad sent Hall Exhibit M, marked "**** Please don't share ****," and wrote: "My feedback for Nathan's performance plan is attached. This will go out to Leigh Ann by COB today. After HCO accepts this version, you need to establish a new PP for Nathan." Thus, even while evaluative feedback and ratings were being circulated internally, Ahmad was telling Hall not to share the draft and was contemplating a "new PP" only after Human Capital accepted the version already under review. This sequence further supports the

39

inference that the agency was not applying a normal performance process. It was constructing and revising that process through executive and Human Capital coordination while Plaintiff remained in the middle of disability-related leave disputes and unresolved accommodation issues.

Taken together, these communications support more than mere simultaneity. They show a progression in which Plaintiff's disability-related sick leave was first treated as an attendance problem and then as a "pattern"; Plaintiff was then placed under an undocumented probation narrative and unique restrictions; after Plaintiff questioned that status and sought accommodation, officials shifted to an "extended period of performance"; and while accommodation decisions were being coordinated and denial language was being drafted, senior officials and counsel were simultaneously retroactively defining Plaintiff's evaluation period, demanding draft plan materials, discussing whether he was failing elements, and moving toward a negative rating and possible PIP. The resulting performance escalation therefore at least appeared to derive from the same disability-related sequence that began with Plaintiff's flare-related leave use and intensified when Plaintiff sought accommodation and objected to discriminatory treatment.

That progression was medically destabilizing. Plaintiff's hidradenitis suppurativa is a chronic inflammatory condition aggravated by sustained psychological stress. Yet while the agency was acknowledging his disability and processing his request for accommodation, it subjected him to escalating attendance restrictions, executive-driven performance scrutiny, shifting status labels, retroactive evaluation dates, and internal assertions of failure within a process that had not been settled or transparently communicated. The convergence of disability-related leave scrutiny, accommodation resistance, and irregular performance escalation created

40

sustained stress during active management of a stress-reactive condition and contributed to the worsening of Plaintiff's symptoms and working environment.

These claims are not directed at the substance of any performance rating. They concern whether OSC's substantial departures from its ordinary performance-management processes, while Plaintiff was seeking accommodation using disability-related leave that the agency specifically and repeatedly cast as improper, were themselves part of discriminatory, retaliatory, and interfering conduct under the Rehabilitation Act.

### F. Suspension and Resignation

By early November 2022, Plaintiff had disclosed a chronic medical condition, requested full-time telework as a reasonable accommodation, used disability-related sick leave, objected to heightened medical documentation requirements imposed after his disability became known, and declined to accept the agency's baseline schedule as an accommodation. These actions constituted protected activity under the Rehabilitation Act and occurred during a compressed period in which the agency had direct knowledge of Plaintiff's disability and accommodation request.

During that same period Plaintiff also cited applicable OPM leave regulations when objecting to the agency's requirement that he provide medical certification for each instance of disability-related sick leave. After Plaintiff cited the governing leave policy, the agency withdrew the certification requirement that had been imposed despite the agency's prior confirmation that Plaintiff had a qualifying disability. The withdrawal occurred only after Plaintiff challenged the legality of the requirement.

Rather than stabilizing the situation after Plaintiff asserted his rights under federal leave regulations and declined to accept the agency's accommodation denial, the agency escalated the

41

actions already underway. The escalation culminated on November 11, 2022 when Chief Information Officer Ammar Ahmad transmitted an email attaching a document titled "Suspension Notice," placing Plaintiff on paid investigative leave.

The notice accused Plaintiff of "unauthorized access," specifically alleging that he had accessed an OSC employee email account without authorization. The access referenced in the notice related to legacy OSC.gov materials and email content connected to Smita Patel, who was not an employee at the time of the alleged access. The notice did not identify any newly discovered technical event, system alert, or intervening operational incident occurring between the previously disclosed access activity and the issuance of the suspension.

Earlier, during a disability-related flare-up in September 2022, Plaintiff informed his supervisor, Vance Hall, that he would telework that day and perform assigned duties requiring access to legacy OSC materials. Plaintiff described the nature of the access he intended to perform. Hall responded in writing: "That is fine for today." (Exhibit X). Hall would go on to fall to report this approve and convey the appearance that Plaintiff accessed this information without notice or a business need (Exhibit B).

The November 11 suspension therefore reframed previously disclosed and supervisor-approved activity as "unauthorized access" after Plaintiff had engaged in protected disability-related activity and after Plaintiff had challenged the agency's handling of his leave and accommodation request. Subsequent legal filings by agency counsel later referenced the suspension as relating solely to Patel's email account.

The suspension occurred after the agency had denied Plaintiff's accommodation request, after Plaintiff had declined to accept the agency's second proposed accommodation, filed an EEO complaint, and after Plaintiff had objected to disability-related leave restrictions that were

42

later withdrawn. The suspension also occurred after a series of undocumented performance actions undertaken outside governing federal performance regulations and agency policy had already been directed at Plaintiff during the pendency of his accommodation request.

The suspension therefore formed part of the same escalating sequence of actions that began after Plaintiff disclosed his disability and sought accommodation.

In the days following the suspension, Plaintiff's medical condition deteriorated. Plaintiff suffers from hidradenitis suppurativa, a chronic inflammatory disease characterized by recurrent lesions, tissue damage, and severe pain that is medically known to worsen under sustained psychological stress. The escalation from accommodation denial to investigative suspension, combined with the unresolved workplace restrictions and uncertainty regarding Plaintiff's employment status, intensified stress-related triggers associated with his condition.

Plaintiff experienced worsening symptoms and concluded that the continuation of the escalating actions directed at him—including suspension and the unresolved accommodation dispute—posed a direct risk to his health.

On November 18, 2022, one week after receiving the suspension notice, Plaintiff submitted a signed SF-52 stating "Resignation (Due to Constructive Discharge)" and wrote: "Due to the hostile work environment, the repeated harassment/retaliation/threats, the disability discrimination, the incorrect and uncorrected salary payments, the many prohibited personal practices done to me, the false claims made by management, the criminal activity I discovered and reported, discovering that the general counsel attempted to remove me for accusing a manager of harassment as well as the principal deputy special counsel having the new IT division chief retaliate against me for that same reason, and the serious health effects I'm suffering as a result, continued employment at this agency is unsafe, unreasonable, untenable,

43

and impossible. I resign on 11/18/2022 effective immediately due to constructive discharge."
(Exhibit Q).

The SF-50 subsequently issued by the agency reflects the nature of action as
"RESIGNATION" and states in the remarks field: "REASON FOR RESIGNATION: TO
PURSUE OTHER OPPORTUNITIES." (Exhibit R). The SF-50 does not reproduce or reference
Plaintiff's stated reason for resignation as set forth in his signed SF-52 and contemporaneous
email.

Plaintiff's suspension and resignation therefore occurred as the culmination of the same
sequence of escalating actions that followed Plaintiff's disability disclosure, accommodation
request, objections to disability-related leave restrictions, and refusal to accept the agency's
accommodation denial. The suspension immediately preceded Plaintiff's separation from federal
service and directly contributed to the conditions that made continued employment medically
unsafe and untenable.

### G. Reclassification of Approved Disability-Related Sick Leave and Sick-Related Telework as Misconduct, and Imposition of Targeted Attendance Restrictions

Before September 2022, Plaintiff managed flare episodes from hidradenitis suppurativa
through ordinary workplace communication, including same-day requests for situational
telework or sick leave. Before Ahmad imposed the undisclosed "probation" attendance
restriction on September 8, 2022, Plaintiff had used only four sick-leave entries reflected in the
official time records: 8 hours on August 8, 2022, 2 hours on August 11, 2022, 3 hours on August
24, 2022, and 8 hours on September 2, 2022, all coded as sick leave in the agency's official
timekeeping system (Exhibit G, highlighted under the sick leave code 62). These entries do not
reflect excessive or unsupported leave. They reflect a small number of approved sick-leave uses

44

over roughly one month. Hall later stated that when Plaintiff did not come into the office, Plaintiff would notify management that he was having a flare-up, placing management's knowledge of flare-related absences at the beginning of the sequence that led to the four-day in-office attendance requirement.

Even so, the agency began treating these same instances of leave as a problem despite having approved them and despite knowing they were connected to flare-ups. That characterization intensified over time. By mid-September, Ahmad was describing Plaintiff's leave as a pattern of frequent use, and by the leave audit requested on October 27 and revised through November 1 (Exhibit C), the same approved episodes were being recast as improper. In that revised table, approved absences were no longer presented simply as approved sick leave in the timekeeping system, but were described as "unscheduled leave" and written in red as well as related attendance problems, while the audit also grouped sick-related telework together with sick leave as part of the same supposed attendance issue. When Hall initially created the table and did not cast the leave this way. The audit further omitted the approval context and presented selected entries in a way that made them appear unilateral, improper, or misconduct-based. The attendance restriction imposed on September 8 therefore followed only a limited number of approved flare-related sick-leave uses, yet those same approved episodes were later recast by the agency as evidence of attendance problems and supposed misconduct rather than as protected, illness-related absences. Hall described what followed as the a progressive sequence of events thereafter.

On September 8, 2022, Ahmad instructed Hall that Plaintiff was required to come into the office because he was "on probation" and directed Hall to begin requiring in-office attendance the following week. Plaintiff had not been told that he was on probation, had not received any

45

probation memorandum, and had not been given written standards tied to any probationary or extended-performance status. The following day, Hall informed Plaintiff that he would be required to report in person Monday through Thursday due to a shortage in helpdesk coverage and other circumstances. Hall did not tell Plaintiff that Ahmad had already said the requirement was because Plaintiff was supposedly on probation.

When Plaintiff arrived at the office on September 12, 2022, no other IT personnel were present. Hall told Plaintiff that everyone's new schedule started that week but that Plaintiff was the only one in the office that day. Plaintiff later confirmed with other IT staff that their schedules had not changed and that they had not been directed to report in person four days per week. In later sworn statements, Hall and Ahmad acknowledged that the four-day in-office attendance requirement applied only to Plaintiff.

Hall and Ahmad later described the same four-day in-office attendance requirement by reference to Plaintiff's attendance, flare-related absences, and what they described as a pattern of sick-leave abuse. Plaintiff was not told at the time the restriction was imposed that any such concern was being used as its basis, and he was not then asked to provide medical support or other information addressing the leave usage the agency was treating as problematic. The same attendance requirement was thus associated at different times with probation, staffing needs, and later with attendance and alleged leave abuse.

Before Ahmad began describing Plaintiff's sick leave as a "pattern," Plaintiff had used sick leave only a limited number of times after returning to duty, and those absences were entered as approved and self-certified. The timesheets did not reflect excessive, unauthorized, or unsupported sick leave. Nor was there a policy prohibiting the use of sick leave on scheduled in-office days. On September 14, 2022, after a sick-leave email had been blocked by the agency's

46

filtering system and later confirmed as sent, Ahmad wrote that there was definitely a pattern of frequent sick-leave requests from Plaintiff. By that point, the four-day attendance restriction had already been imposed.

On September 26, 2022, Plaintiff sought situational telework during a flare-up rather than calling out sick, and Hall approved that request for the day. Hall later stated, however, that Plaintiff was then told he could not use situational telework under any circumstances and would instead have to use annual or sick leave. Hall further stated that Plaintiff was required to provide a doctor's note for sick leave based on his history of calling out sick, although Hall acknowledged that he hardly ever asked for such notes. Plaintiff objected that Ahmad had blocked him from using situational telework for illness and that he was being subjected to restrictions not imposed on other employees. Ahmad likewise stated that, after consultation with General Counsel and Human Capital, he required medical certification for sick leave.

By mid-to-late September 2022, Plaintiff's disability-related absences were no longer being handled solely through ordinary supervisory and timekeeping channels. On September 28, 2022, Ullman asked Massey and Taylor to determine whether Plaintiff had taken sick leave during the week of September 12 and when that leave had been submitted. Taylor then sent Ullman and Massey a separate leave table listing leave type, dates, hours, submission dates, and approval status (Exhibit Z).

On October 27, 2022, Ahmad asked Hall for a leave-and-attendance table (Exhibit C). By November 1, 2022, Ahmad had revised that table himself and told Beckett and Ullman that he had made edits in red based on his own record and that they should use that version. The revised table described selected entries in terms such as unscheduled telework without prior supervisory approval, unscheduled leave, and unscheduled leave combined with coming late to work. It did

47

not present planned leave in the same manner. Hall had approved most of the same-day situational telework and sick-leave episodes reflected in the table, and some had been approved by Ahmad himself before Hall became supervisor on August 17, 2022. The revised table did not preserve that approval context. It also included both sick-related telework and sick-related leave in the same compilation.

By the time that revised audit was created, Ahmad had already used "frequent pattern" language, the agency had already imposed the four-day attendance restriction, situational telework on mandatory in-office days had already been curtailed, and Massey had already confirmed that Plaintiff's medical documentation established a qualifying disability. During the same period, the agency maintained the existing attendance restrictions, denied full-time telework, and proceeded with performance-related actions even though Plaintiff had not been given valid finalized standards before the asserted end of the performance period.

Hall and Ahmad later described the four-day in-office requirement and related restrictions as a response to Plaintiff's approved sick leave and flare-related absences. Hall's account shows the agency understood those absences to be associated with flare-ups, while Ahmad's account cast the same approved leave as evidence of suspected abuse. Their sworn statements therefore treat Plaintiff's approved, disability-associated leave not as protected medical leave, but as the basis for increased attendance restrictions, certification demands, and related scrutiny.

Moreover, if Ahmad truly believed the probation to be official and already occured, there was no need to hide its nature from Plaintiff as he did.

Across this period, Plaintiff was subjected to a four-day in-office attendance requirement that applied only to him, different explanations were given for that requirement, situational

48

telework used during flare episodes was curtailed, greater use of sick leave followed, doctor's notes were required for sick leave, leave information was separately compiled and circulated among counsel and Human Capital, and approved sick-related telework and leave were later presented in a revised attendance table without their approval context.

### H. Executive and Counsel Control of the Accommodation Process, Supervision, and Performance Following the Presumption of Sick Leave Abuse

Once Plaintiff's disability-related leave and accommodation activity were treated as a suspected abuse issue, Plaintiff's case was removed in practice from the ordinary supervisor-led process and handled through a highly irregular executive-and-counsel structure. The same officials who were framing Plaintiff's leave as a misconduct problem also shaped the substance, timing, documentation, and communication of his accommodation response, leave restrictions, performance period, and later suspension, while Hall's role narrowed to transmitting decisions made above him.

The shift appeared at the outset of the accommodation process. On September 21, 2022, Ahmad asked Massey whether Plaintiff had contacted Human Capital "seeking guidance for his medical need," and framed the issue in terms of the in-office restriction Ahmad had already imposed, writing that Hall had told him Plaintiff was seeking guidance "so that he is not required to come in the office every day." On September 22, Massey responded that Plaintiff was "in the early stages of seeking a reasonable accommodation," that she would determine whether he had a qualified disability based on medical documentation, and that "(t)he request for an accommodation would be approved by his supervisor." Ahmad did not step back after that explanation. Instead, he replied that Plaintiff "has not shared anything with me," even though he had already learned of the medical issue from Hall, and on September 23 confirmed to Massey

49

that Plaintiff had spoken "with Vance" as his "first line supervisor" (Exhibit AJ). The exchange shows that, from the beginning, the request was being routed through Ahmad and framed in relation to the attendance restriction he had imposed, not handled solely through Hall as the supervisor identified in Directive 52.

Massey stated the governing structure and then narrowed Plaintiff's outcome in the same communication. On October 19, 2022, writing to Ahmad and Hall with Plaintiff's request attached, Massey stated that under Directive 52 "the immediate supervisor is the deciding authority for these requests," and that she, "as the Human Capital Chief," had determined Plaintiff's medical documentation was sufficient to establish a qualified disability. In the same email, however, she stated that the documentation "did not specify how telework supports his ability to perform the essential duties of his position" and that, "based on the information provided in the letter and in consultation with OGC, supported accommodations would be access to a private washroom to treat his medical condition and/or authorized unscheduled leave when a flare up occurs." She also directed that the decision be communicated in writing and that the memo be returned to her for recordkeeping. (Exhibit F)

Massey's own sworn statement reflects the same structure. She stated that, as Human Capital Chief, she served as Disability Program Manager and determined whether an employee met the definition of a qualified disability for the agency. She also stated that after Plaintiff sent medical documentation to her and Jessica McDaniels, she "conferred with OGC" regarding whether the condition met the criteria for a qualifying disability, and described the accommodation response as having been handled by "IT leadership" rather than by Hall alone (Exhibit AO). Directive 52 assigned the disability determination to the Medical Review Officer

50

and the accommodation decision to the immediate supervisor; it did not assign OGC a role in deciding whether Plaintiff had a qualifying disability (Exhibit A).

Baxter likewise entered the substance of the first accommodation offer. On October 19, 2022, Baxter wrote that "I guess Ammar can notify Nathan of the following," then set out what Plaintiff was to be told: that staff were required to be in the office two days a week, that OSC could provide access to a private restroom, and that OSC could approve unscheduled leave during flare-ups. Baxter then asked whether Plaintiff would need "a doctor's note to support the flare up condition in order for the unscheduled leave to be authorized" (Exhibit F). Baxter was not Plaintiff's supervisor, yet she was determining the content of the response Hall was supposedly responsible for deciding.

Also on October 19, Massey wrote Ahmad that she had already spoken with Amy Beckett and Susan Ullman, that Plaintiff's original annual rating had been rescinded, that there was "some flexibility" in determining the supposed ninety-day period, and that Human Capital's recommended approach was to begin that period on July 31, 2022, when Vance Hall became Plaintiff's supervisor, so that it would conclude on October 31, 2022. The following day, Massey asked Ahmad whether he wanted to discuss "this and the RA request" and stated that, on the performance side, Amy should be looped in, while also offering to speak with Karl, Kim, and Vance. These communications are significant not only because they show retroactive selection of the operative performance dates near the end of the very period the agency sought to use, but because they show who was doing it and how: Massey, after consultation with agency counsel and senior officials, was presenting a recommended performance framework to Ahmad while Plaintiff's disability had already been recognized and the reasonable-accommodation request remained active. Plaintiff's immediate supervisor was therefore not independently administering

51

a settled and previously disclosed evaluative framework. Instead, executive officials, Human Capital, and counsel were simultaneously shaping Plaintiff's performance timeline and discussing the RA process through the same chain of coordination. This supports the inference that the accommodation process was not being handled through a neutral, individualized, supervisor-centered interactive process focused on Plaintiff's limitations, job duties, and an effective accommodation, but was instead overtaken by leadership and counsel who were also involved in decisions concerning Plaintiff's attendance, performance status, and related restrictions. In context, that usurpation supports Plaintiff's claims of harassment, retaliation, disparate treatment, and failure to accommodate because it shows that Plaintiff's disability-related request was folded into a broader executive-managed process aimed at controlling the outcome rather than identifying and providing an effective accommodation (Exhibit AH)

Brightbill entered the same process without supervisory authority. In the October 27–28 chain addressing Plaintiff's "extended performance period and reasonable accommodation request," Massey wrote that it would be helpful to outline "the steps we discussed regarding Nathan's extended performance period and reasonable accommodation request to help facilitate the process, as well as meet required timelines," and copied Brightbill and Beckett (Exhibit H). Brightbill then asked: "Is that part of standard process to allow him input to his evaluation in this situation? Is it required?" (Exhibit H). Her phrasing treated Plaintiff's handling as exceptional, and her participation placed a non-supervisory executive official inside the same chain controlling both accommodation and performance.

Beckett's role was direct and operational. Massey admitted that she shared Plaintiff's medical information with Beckett (Exhibit F, AO). On October 31, 2022, Ahmad sent Beckett the draft accommodation email and Form 61 and wrote: "As you suggested, please see attached

52

filled Form 61 and email (draft) to Nathan. After you approve this email content and form 61 then I'll go ahead and communicate this to Nathan" (Exhibit AG). In the later chain, Beckett had already instructed Ahmad that he "need(ed) to fill out the attached Form 61, which documents the denial/offer of alternate Reasonable Accommodation," after which Ahmad wrote: "Vance and I have consulted, and he is ok with the revised offer. Let me know please of your feedback and when can I or Vance can communicate this to Nathan." (Exhibit AG) Hall appears there not as the deciding official described by Directive 52, but as someone whose assent followed Beckett's direction and whose communication to Plaintiff awaited further feedback.

Beckett also moved outside any legal-review role and into Plaintiff's work assignments. In late October 2022, Beckett assigned Plaintiff subpoena-related research involving eCMS, the system Plaintiff managed. After Plaintiff completed that work, Beckett assigned him research involving the agency's paper-record system, which Plaintiff did not manage, had never used, and for which the ordinary records custodian was not identified to him. Beckett referred Plaintiff to Martha Shethe, but Plaintiff did not receive the operational support later given to the employee who ordinarily handled paper-record research. When a related task arose and Plaintiff routed it to a contractor, Beckett and Shethe bypassed Plaintiff and the contractor and worked directly with the records manager, providing that employee the assistance and support not provided to Plaintiff.

Counsel and executive officials also entered the handling of Plaintiff's leave and attendance because of, and in a manner that advanced, the misconduct and leave-abuse narrative. By late September and early November 2022, Plaintiff's leave information had been pulled into a separate review stream involving agency leadership, Human Capital, and counsel, including targeted summaries and revised leave-tracking materials outside the ordinary supervisor and timekeeping process. Those events are described in greater detail in Section G. (Exhibits C, X)

53

Defendant's accommodation process was usurped by officials outside the ordinary supervisor-centered framework and redirected through executive, Human Capital, and counsel channels. Rather than allow Plaintiff's accommodation request to proceed through a genuine interactive process focused on Plaintiff's limitations, job duties, and an effective accommodation, Defendant routed the matter upward and treated it as a coordinated leadership issue. Massey's October 19 and October 20 communications show that Amy Beckett and Susan Ullman were already involved in discussing Plaintiff's performance status while the reasonable-accommodation request was still active, and Massey expressly linked "this and the RA request" in her communications with Ahmad. In the same exchange, Massey framed the performance question as something to be handled with Amy on "the performance side," while also offering to speak with Karl, Kim, and Vance. These facts support the inference that the accommodation process was not being administered as a neutral, individualized review by the appropriate decisionmakers, but was instead overtaken by senior leadership and counsel who were simultaneously involved in decisions about Plaintiff's attendance, performance status, and other restrictions. In context, that usurpation is probative of harassment, retaliation, disparate treatment, and failure to accommodate because it shows that Plaintiff's disability-related request was folded into a broader executive-managed response designed to control the outcome rather than to identify and provide an effective accommodation (Exhibit H).

When Plaintiff later asked for documentation of the supposed extended period of performance Ahmad said was supposedly created in 2021, neither Massey or Ahmad were able to provide it despite stating that it was based in a 2021 action by Patel (Exhibit J). On October 27, Massey's email to Ahmad (Exhibit H), with Brightbill and Beckett copied, addressed both the accommodation response and the performance closeout. Ahmad then replied that, "(a)s you,

54

Amy and I discussed on the meeting this week," Hall would provide him draft performance-plan feedback, Plaintiff would be given input, and Ahmad would review the feedback (Exhibits AH). The November performance emails continued that same structure. Ahmad first told Hall on October 27, "As discussed please provide (draft) by tomorrow afternoon," and later that evening told Plaintiff and Hall: "Your extended period of performance ends on October 31st" (Exhibit AA).

By late October and early November 2022, the record shows that Defendant's second accommodation denial was being scripted and managed through counsel, Human Capital, and leadership rather than through a neutral interactive process. On October 31, Ahmad sent Amy Beckett and Leigh Ann Massey a draft denial email and completed Form 61, stating that he would send the materials to Plaintiff only after Amy approved both the email and the form. In the same chain, the draft denial treated full-time telework as denied and substituted access to private restrooms in the headquarters building as the supposed alternative accommodation. A related chain shows that Beckett had already instructed Ahmad that Form 61 needed to document the "denial/offer of alternate Reasonable Accommodation," and Ahmad later told Beckett and Massey that he and Hall had consulted and that Hall was "ok with the revised offer," while separately telling Hall not to discuss or share the matter. The final November 7 email then denied full-time telework, directed Plaintiff to the attached Form 61 for the reason for denial, and presented the agency's proposed arrangement as the operative accommodation for the next six months. Taken together, these communications support the inference that the second denial was not the product of a genuine, individualized interactive process, but of a pre-scripted and lawyer-reviewed effort to package a denial and alternate proposal as if it were a valid accommodation outcome. (Exhibit, P, AI AD)

55

From late October through mid-November 2022, Plaintiff's accommodation request was handled through a chain involving Ammar Ahmad, Leigh Ann Massey, Amy Beckett, and other senior officials rather than through a direct supervisor-centered interactive exchange with Plaintiff. On October 31, 2022, Ahmad sent Beckett and Massey a draft denial email and Form 61 for review and approval before sending anything to Plaintiff. On November 3, 2022, Ahmad again communicated with Beckett and Massey about revised accommodation language, stated that Vance Hall was "ok" with the revised proposal, and separately told Hall not to discuss or share the matter. On November 7, 2022, Plaintiff received the denial of full-time telework together with the agency's alternate proposal.

The same officials continued addressing the matter after the November 7 denial. On November 15, 2022, after Plaintiff had been denied full-time telework and placed on investigative leave, Beckett asked Ahmad when he had submitted the Form 61 for what she described as a negotiated or agreed four-day telework accommodation. Ahmad responded that the relevant date was November 7 and added that the first offer had been sent on October 27. These communications show that the accommodation request, the denial language, the Form 61, and the characterization of the agency's proposal were being discussed and managed among counsel, Human Capital, and senior management during and after the accommodation process.

Hall's and Ahmad's sworn statements also described the specific restrictions that followed the presumption of leave abuse. Hall stated that when Plaintiff reported flare-ups, he was told he could not work from home on mandatory in-office days and instead "would have to use annual leave or sick leave," and Hall added that he "hardly ever ask(s) for a doctor's note" even though Plaintiff was later required to provide one for sick leave. Ahmad similarly stated

that Plaintiff's leave data suggested a pattern of leave abuse because Plaintiff was taking leave on days he was expected to be in the office. This conflicts with the official record which shows a single day of leave on an in-person workday (Exhibits AA, AB)

The same sequence culminated in suspension shortly after Plaintiff refused to accept the second accommodation offer. Plaintiff did not accept the November 7 accommodation communication and, by November 8, continued to reject the substitute arrangement in place of full-time telework. On November 11, the agency issued the suspension notice. Ahmad later stated under oath that Beckett was the person who told him to initiate the suspension. (Exhibits AA, AB) Beckett had no supervisory authority over Plaintiff or anyone else, yet, according to Ahmad's own account, she directed him to initiate that negative action and had it carried out through officials who did possess formal authority.

Following the presumption of sick leave abuse, Plaintiff's accommodation request, supervision, performance, leave tracking, and later suspension were therefore not handled through Hall as a supervisor-centered process. They were shaped through executive and counsel channels above him, including by Beckett and Brightbill, who had no supervisory authority over anyone at the agency, yet participated in determining what Plaintiff would be told, what restrictions would accompany flare-related leave, how his performance period would be timed and closed out, how his leave would be tracked and characterized, and when negative action would be initiated.

## I. Medical Documentation, Circulation Among Agency Officials, and Use of Disability Information in Related Employment Decisions

Plaintiff submitted medical documentation in support of a reasonable-accommodation request concerning hidradenitis suppurativa, a chronic inflammatory condition involving

recurrent and unpredictable flare episodes. The documentation described limitations and triggers relevant to Plaintiff's work conditions, including friction, moisture, travel, and sustained psychological stress. Under Directive 52, the Medical Review Officer was responsible for obtaining and evaluating medical documentation to determine whether the employee met the definition of a qualified individual with a disability, while the immediate supervisor was the deciding official for the accommodation itself. Directive 52 did not assign OGC a role in deciding whether Plaintiff had a qualifying disability. (Exhibit A)

The record reflects that Plaintiff's medical information did not remain confined to a narrow medical-review and implementation channel. Massey stated in her sworn affidavit that Plaintiff sent medical documentation to her and Jessica McDaniels and that she "conferred with OGC" regarding whether the condition met the criteria for a qualifying disability. She also stated that, as Human Capital Chief, she served as Disability Program Manager and determined whether an employee's condition met the definition of qualified disability for the agency (Exhibit AO). In a separate sworn statement, Hall described Ahmad asking him directly "what the condition was," and responded: "If he shares it with me, I will share it with you," later adding: "At some point the medical condition was I relayed that information to my manager." (Exhibits AA, AB). Plaintiff did indeed share it with Hall around September 12-14.

By October 19, 2022, Plaintiff's accommodation request and related disability information were circulating through a broader group of officials. On that date, Massey wrote Ahmad and Hall that Plaintiff's documentation was sufficient to establish a qualified disability, attached Plaintiff's request to the message, and stated that, "based on the information provided in the letter and in consultation with OGC, supported accommodations would be access to a private washroom to treat his medical condition and/or authorized unscheduled leave when a flare up

58

occurs." (Exhibit AE) Later that same day, Ahmad forwarded the communication to Karl Kammann and Kimberley Baxter with "FYSA." (Kim Tells Ammar how to respond to request.pdf) Baxter then replied with the terms she proposed Plaintiff be given, writing: "I guess Ammar can notify Nathan of the following," followed by the two-day in-office schedule, private-restroom access, unscheduled leave during flare-ups, and the question whether Plaintiff would need "a doctor's note to support the flare up condition in order for the unscheduled leave to be authorized." (Exhibit F)

Directive 52 was repeatedly cited by the same officials who circulated Plaintiff's medical and accommodation information beyond the limited roles described in that directive. Massey invoked Directive 52 while identifying Hall as the immediate-supervisor decision maker, yet in the same communications she shared Plaintiff's request and disability information with Ahmad and consulted OGC regarding the qualifying-disability determination. The same executive-and-counsel group then used that information in discussions addressing accommodation terms, flare-related leave, attendance restrictions, and performance timing. The record therefore reflects that the officials handling Plaintiff's request were not unaware of the agency's accommodation framework or its confidentiality structure when Plaintiff's medical information was circulated and used in related employment actions.

After the first denial, Amy Beckett became deeply involved in the accommodation process, reviewing draft denial language, directing preparation of Form 61 materials, and participating in the development of the agency's proposed alternative arrangements. Because Beckett was proposing and revising accommodation terms that depended on how Plaintiff's specific condition was affected by office attendance, telework, and related workplace conditions, her participation necessarily presupposed access to information about Plaintiff's disability and

59

asserted limitations beyond a bare statement that some accommodation request existed. The record also shows that Massey had already shared disability-related information during the process and that Ahmad further circulated accommodation matters while consulting Beckett and others about the agency's response. These events placed Plaintiff's medical and accommodation information in the hands of officials who were not merely implementing an approved accommodation, but were actively shaping denial language and related employment responses.g

The same information was not only circulated in connection with the accommodation response. It was used in related restrictions and employment actions while the accommodation process remained active. The October 19 and October 27 communications show Plaintiff's disability status, requested accommodation, flare-related leave, and work restrictions being discussed in the same set of executive-and-counsel channels that were also addressing his attendance, asserted performance period, and later performance closeout. On October 27, Massey wrote Ahmad, with Brightbill and Beckett copied, that it would be helpful to outline "the steps we discussed regarding Nathan's extended performance period and reasonable accommodation request to help facilitate the process, as well as meet required timelines." She then stated that Ahmad had already "established the reasonable accommodation that will be granted," supplied model language for the accommodation communication, fixed the July 31 to October 31 performance period, and asked whether Plaintiff was "failing in 1 or more of his performance elements" (Exhibit AH). The same email chain thus placed Plaintiff's disability information, accommodation request, and performance planning into one combined discussion.

The record also reflects that Plaintiff's disability information was used in shaping the terms of flare-related leave and attendance restrictions. The accommodation-related communications did not remain limited to whether Plaintiff had a qualifying disability and what

accommodation should be granted. They also addressed whether Plaintiff could work remotely during flare episodes, whether Plaintiff would instead be limited to unscheduled leave, and whether doctor's notes would be required for flare-related absences (Exhibits AH, F) Unscheduled leave was the very thing the agency would later frame as misconduct despite the agency offering this in their initial accommodation denial

OSC's published records framework also contemplated a more controlled method of handling disability-related information than the one reflected here. Plaintiff's reasonable-accommodation and medical information fell within the subject matter addressed by OSC-3 and OSC-4, which governed the maintenance and handling of employee and accommodation-related records. Plaintiff's accommodation request and medical materials were not confined to a discrete, consistently maintained confidential recordkeeping process under those systems. Instead, the information was circulated through multi-party email chains involving Human Capital, agency counsel, and executive officials and was used in discussions that also addressed leave, attendance, performance timing, and related employment actions. The resulting handling was not limited to preserving medical information for accommodation administration. It embedded that information in broader management discussions affecting Plaintiff's work conditions and status Exhibits A, AE.

Plaintiff's medical and accommodation information was therefore not confined to a limited process for determining disability status and implementing an accommodation. It circulated through multi-party communications involving Human Capital, agency counsel, and executive officials, and those same channels were used to shape the accommodation response, the handling of flare-related leave, the related attendance restrictions, and the framework for Plaintiff's performance period and evaluation.

61

The administrative record also shows that OSC had a more formal and confidential method for handling accommodation determinations in other instances. In accommodation materials for another employee, the agency issued a discrete written determination titled "Request for Reasonable Accommodation," and associated communications were marked "Sensitive: Confidential" (Exhibit AN). Plaintiff's materials were not handled in that manner. Instead, his request and related disability information moved through broader executive-and-counsel email chains that also addressed leave, attendance, performance, and punitive employment actions (Exhibits F, AH).



These conditions were not medically neutral for Plaintiff. They involved repeated demands that Plaintiff report in person despite a condition aggravated by physical workplace conditions and sustained stress, repeated disputes over whether Plaintiff could work remotely

62

during flare episodes, and the continuing use of Plaintiff's leave, attendance, and disability information in the same management channels that were shaping restrictions and other employment actions. By the time the second accommodation communication was issued and the suspension notice followed, Plaintiff was facing an environment in which the condition itself, the leave associated with that condition, and the accommodation request prompted expanding restrictions rather than stabilization. The agency had been informed that stress and physical workplace conditions were triggers for Plaintiff's disease, yet the working conditions imposed on Plaintiff intensified rather than eased after that information was provided.

The record also showed Plaintiff that the agency would not stop restricting or punishing his use of sick leave even after accepting that he had a qualifying disability. Plaintiff's flare-related absences were treated as an attendance problem, then as a "pattern," then as a basis for heightened attendance restrictions, loss of situational telework during flare episodes, demands for doctor's notes, manual leave tracking, and further negative action. The agency's treatment of Plaintiff's leave therefore did not stabilize after disability confirmation. The same conduct continued while accommodation remained disputed and while additional restrictions were being imposed.

That sequence created a reinforcing stress-and-disease cycle. When agency officials imposed a new restriction, framed Plaintiff's leave as abuse, altered the conditions under which he could work, or advanced another irregular action, Plaintiff's stress and anxiety increased. Stress was itself a documented trigger for Plaintiff's disease known by the agency. As Plaintiff's condition worsened and flare episodes required time away or workplace adjustment, the agency treated that resulting leave and accommodation need as a further basis for scrutiny, restrictions, and additional adverse measures. The same pattern then repeated. Plaintiff was thus placed in a

63

loop in which the agency's response to the condition aggravated the condition, and the aggravation of the condition in turn exposed Plaintiff to further restrictions and pressure. (RE_ Reasonable Accommodation Request.pdf); (Exhibits AA, AB); (Exhibit AH) This anxiety and stress was in addition to Plaintiff's fear and anxiety that the disease was returning due to the OSC's actions and would necessitate multiple surgeries as it had prior to 2018.

Once the agency refused to provide an accurate and supportive accommodation and instead continued to impose conditions that aggravated the disease, Plaintiff was forced into a choice between preserving his job and protecting his health. Plaintiff had requested full-time medical telework to avoid the very workplace triggers identified in his medical documentation. The agency did not provide that accommodation. Instead, it continued the in-office requirements, tied flare episodes to leave scrutiny, and maintained a course of conduct that increased stress and physical aggravation while also advancing performance and disciplinary measures. At that point, continuing to work under those conditions meant continued exposure to the triggers and pressures that were worsening the disease, while resisting those conditions meant continuing conflict with management over leave, attendance, and accommodation.

Plaintiff resigned on November 18, 2022, after the second accommodation denial and the November 11 suspension notice, and after the agency had already circulated negative performance materials internally while maintaining the restrictions described above. In that setting, resignation followed not from an isolated disagreement, but from a cumulative sequence of medically destabilizing restrictions, unresolved disability-related conflict, and escalating employment actions that left Plaintiff unable to continue working without further harm. Resignation did not stop the effects of the agency's conduct. Plaintiff experienced renewed flare activity during and after this period of sustained workplace escalation. Treatment resumed with

intralesional injections beginning in December 2022 and early 2023. Between April and July 2023, the condition progressed and caused irreversible damage to layers of the skin, requiring multiple surgical excisions. Additional treatment was later required in January 2026. These developments followed a period in which Plaintiff had been required to work under escalating attendance restrictions, unresolved accommodation disputes, performance-related uncertainty, and a suspension notice while the agency possessed medical documentation identifying the very triggers aggravated by those conditions. (Medical records/exhibits to be cited)

**J. Escalating Restrictions, Stress-Related Disease Exacerbation, and Plaintiff's Resignation**

The medical limitations and triggers described above did not remain abstract concerns during Plaintiff's employment. From September through November 2022, after the agency had been informed that stress and workplace conditions aggravated Plaintiff's disease, Plaintiff remained subject to an escalating sequence of attendance restrictions, leave scrutiny, accommodation denials, performance-related pressure, and suspension. The same period included the four-day in-office requirement, the loss of situational telework during flare episodes, demands for doctor's notes for sick leave, the continued treatment of Plaintiff's leave as a suspected abuse pattern, unresolved accommodation disputes, the retroactive structuring of a performance period, negative internal performance drafting, and the November 11 suspension notice.

Those conditions created a reinforcing cycle between workplace stress and disease activity. When agency officials imposed a new restriction, framed Plaintiff's leave as abuse, denied the requested accommodation, or advanced another negative action, Plaintiff's stress increased. Stress was one of the triggers identified in Plaintiff's medical documentation. As Plaintiff's symptoms worsened and flare episodes required leave or workplace adjustment, the

agency treated that resulting need as a further basis for scrutiny, certification demands, and additional restrictions. The same pattern then repeated.

By the time the second accommodation communication was issued and the suspension notice followed, Plaintiff had been shown that the agency would not stop trying to restrict or punish his use of sick leave even after accepting that he had a qualifying disability. The agency did not provide the full-time telework accommodation Plaintiff requested to avoid the medically identified triggers. Instead, it continued the in-office requirements, tied flare episodes to leave scrutiny, and maintained a course of conduct that increased stress and physical aggravation while also advancing performance and disciplinary measures. At that point, Plaintiff was forced to choose between continuing to fight to keep his job and protecting his health. Under the conditions imposed by the agency, he could not do both.

Plaintiff resigned on November 18, 2022, after the second accommodation denial and the November 11 suspension notice, and after the agency had already circulated negative performance materials internally while maintaining the restrictions described above. The resignation followed a cumulative sequence of medically destabilizing work conditions, unresolved disability-related conflict, and escalating employment actions that left Plaintiff unable to continue working without further harm.

Resignation did not stop the effects of the agency's conduct. The recurrence that began during the period of escalating restrictions continued after Plaintiff left OSC and required further medical intervention over time, including treatment in December 2022 and January 2023, surgical procedures in April and July 2023, and additional treatment in January 2026.

66

## IV. Counts

### COUNT I – Failure to Provide a Reasonable Accommodation

(Rehabilitation Act of 1973, 29 U.S.C. §§ 791, 794(d), 794a(a)(1); 29 C.F.R. §§ 1630.2(o),

1630.2(n), 1630.9; 29 C.F.R. § 1614.203)

Plaintiff realleges and incorporates all preceding allegations, statements, and facts as if fully set forth herein.

The Rehabilitation Act requires a federal agency to provide a reasonable accommodation to the known physical or mental limitations of an otherwise qualified employee with a disability unless the agency demonstrates that the accommodation would impose an undue hardship. The Act incorporates ADA standards, including the requirement of reasonable accommodation, the definition of a qualified individual, the concept of essential functions, and the obligation to engage in an individualized accommodation inquiry. 29 U.S.C. §§ 791, 794(d), 794a(a)(1); 42 U.S.C. §§ 12111(8), 12112(b)(5)(A); 29 C.F.R. §§ 1614.203, 1630.2(n), 1630.2(o), 1630.9. The D.C. Circuit has recognized that a failure-to-accommodate claim under the Rehabilitation Act turns on whether the employee was disabled, qualified, and denied a reasonable accommodation, and that the accommodation inquiry requires a flexible, interactive assessment rather than a predetermined result. *Solomon v. Vilsack*, 763 F.3d 1, 9–10 (D.C. Cir. 2014); *Ward v. McDonald*, 762 F.3d 24, 31–32 (D.C. Cir. 2014).

Plaintiff is a qualified individual with a disability within the meaning of the Rehabilitation Act. Plaintiff has hidradenitis suppurativa, a chronic inflammatory disease that causes unpredictable flare episodes involving severe pain, inflammation, drainage, skin breakdown, infection risk, and substantial limitations affecting Plaintiff's ability to walk, sit, commute, and remain in a conventional office environment during active episodes. Plaintiff

provided Defendant with medical documentation describing the nature of the condition, its unpredictability, its triggers, and the resulting work limitations. Defendant later acknowledged that Plaintiff's documentation established a qualifying disability. At all relevant times, Plaintiff remained able to perform the essential functions of Plaintiff's IT position with remote work as an accommodation, and Defendant did not identify any specific essential job duty that required routine physical presence in the office.

On or about September 21, 2022, Plaintiff requested full-time medical telework as a reasonable accommodation for that condition. The request was supported by medical documentation explaining that flare episodes were unpredictable and that minimizing commuting, workplace friction, moisture, and related stressors was necessary to prevent exacerbation of the disease. Full-time telework would have permitted Plaintiff to continue performing Plaintiff's IT duties while managing flare episodes at home and avoiding medically unnecessary leave. A schedule or workplace-location modification that enables a qualified employee to perform the essential functions of the position is a recognized form of reasonable accommodation under the governing statute and regulations. 42 U.S.C. § 12111(9); 29 C.F.R. § 1630.2(o).

After Plaintiff made that request, Defendant did not resolve it through a straightforward, individualized assessment of Plaintiff's job duties, functional limitations, and the feasibility of remote work. Instead, as alleged throughout this Complaint, the accommodation process was routed through senior leadership, Human Capital, and agency counsel, and the decisionmaking process became irregular and predetermined rather than interactive and flexible. Plaintiff alleges that Defendant did not follow a genuine give-and-take process directed toward identifying an effective accommodation, but instead moved toward denial while treating already existing or

68

previously rejected arrangements as if they were accommodations. That is inconsistent with the individualized and interactive approach required by the Rehabilitation Act and the ADA standards it incorporates. *Ward*, 762 F.3d at 31–32; 29 C.F.R. § 1630.9. Defendant denied Plaintiff's requested accommodation without identifying a specific essential function that required physical attendance and without stating that full-time telework would impose an undue hardship. Instead, Defendant treated Plaintiff's return to the agency's baseline attendance schedule as if it were an accommodation.



same in-office requirement that caused the problem in the first place. The process was also not interactive. Defendant did not engage Plaintiff in a genuine back-and-forth discussion to determine whether its proposed measures would address Plaintiff's limitations or allow Plaintiff to perform the position without renewed exposure to flare-related triggers. Instead, Defendant communicated with Plaintiff only through denials and proposed alternatives while the actual decisionmaking was handled through management, Human Capital, and counsel. In substance, Defendant again refused full-time telework and substituted measures that did not remove the disability-related barriers identified in Plaintiff's request and medical documentation. The governing standards do not permit an employer to deny an otherwise facially reasonable accommodation without identifying a legitimate essential-function barrier or undue-hardship basis. 29 C.F.R. § 1630.9(a).

During the same period, Defendant was treating Plaintiff's disability-related leave and attendance as management concerns, circulating accommodation-related communications through counsel and leadership, and maintaining disability-related restrictions and scrutiny while the request remained pending. Those circumstances support the inference that Defendant did not conduct the individualized assessment required before rejecting Plaintiff's requested accommodation, but instead allowed the accommodation process to be shaped by the same disability-related suspicion and escalating restrictions alleged elsewhere in this Complaint. Comparator evidence, as alleged elsewhere in the Complaint, further supports the allegation that full-time telework was not categorically unavailable to Defendant as an accommodation tool. That comparator evidence is relevant not because Plaintiff must prove identical treatment at the pleading stage, but because it supports the inference that Defendant's assertion that full-time telework could not be provided was not a fixed or neutral agency position. Combined with

70

Defendant's failure to identify any essential-function barrier or undue hardship, the pleaded facts support the inference that the denial was not based on a legally sufficient accommodation analysis.

As a direct and foreseeable result of Defendant's refusal to provide full-time medical telework, Plaintiff was forced either to report to the office during medically active flare periods or to use additional sick leave to avoid worsening the condition. The denial left Plaintiff exposed to the workplace and commuting conditions identified in Plaintiff's medical documentation as disease triggers, aggravated Plaintiff's condition, depleted Plaintiff's leave, caused wage loss, and contributed to renewed flare activity requiring further medical treatment. Those injuries were the foreseeable consequence of denying a facially reasonable accommodation that would have enabled Plaintiff to continue working while reducing disability-related harm.

Accordingly, Defendant violated the Rehabilitation Act by denying Plaintiff's request for full-time medical telework, substituting continued office attendance and other ineffective measures for the requested accommodation, failing to engage in the legally required individualized and interactive assessment of whether full-time telework would enable Plaintiff to perform the essential functions of Plaintiff's position, and failing to identify any essential-function or undue-hardship basis for the denial. 29 U.S.C. §§ 791, 794(d), 794a(a)(1); 42 U.S.C. §§ 12111, 12112(b)(5)(A); 29 C.F.R. §§ 1614.203, 1630.2(n), 1630.2(o), 1630.9.

## COUNT II – Retaliation and Interference with Protected Disability Rights
### (Rehabilitation Act of 1973, 29 U.S.C. §§ 791, 794, 794(d), 794a(a)(1); ADA standards incorporated through 29 U.S.C. § 794(d), including 42 U.S.C. § 12203; 29 C.F.R. §§ 1614.203, 1630.12)

Plaintiff realleges and incorporates all preceding allegations, statements, and facts as if fully set forth herein.

The Rehabilitation Act prohibits a federal agency from retaliating against an employee for invoking disability-related rights and incorporates the ADA's separate prohibition on coercing, intimidating, threatening, harassing, or interfering with any individual in the exercise or enjoyment of rights protected by that statute. 29 U.S.C. §§ 791, 794(d), 794a(a)(1); 42 U.S.C. § 12203(a)–(b); 29 C.F.R. §§ 1614.203, 1630.12. Retaliation includes conduct that could dissuade a reasonable employee from requesting accommodation, opposing disability-related restrictions, or otherwise exercising protected rights. Interference includes conduct that makes the exercise of those rights more difficult, burdensome, or coercive even apart from a final adverse action. *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006); *Mogenhan v. Napolitano*, 613 F.3d 1162, 1166–68 (D.C. Cir. 2010).

Plaintiff engaged in protected activity when Plaintiff disclosed disability-related limitations, requested reasonable accommodation, submitted supporting medical documentation, used flare-related sick leave, objected to Defendant's per-absence medical-certification demand, and refused to accept Defendant's baseline attendance arrangement as a legally sufficient accommodation. Defendant had actual knowledge of that protected activity. Plaintiff submitted an accommodation request through the agency's accommodation process, Defendant received and reviewed medical documentation, and Defendant formally acknowledged that Plaintiff had a qualifying disability.

After Plaintiff engaged in that protected activity, Defendant responded not with a neutral accommodation process, but with escalating burdens tied to Plaintiff's disability-related leave use and accommodation activity. As alleged throughout this Complaint, Defendant treated

Plaintiff's flare-related leave as a problem demanding heightened management attention, tied increased in-office attendance and later certification requirements to Plaintiff's attendance and sick-leave history, and escalated scrutiny after Plaintiff sought protection for the same condition that Defendant later recognized as a qualifying disability. Those facts support the inference that Defendant's challenged actions were not ordinary leave administration or routine supervision. They were part of an escalating response to Plaintiff's exercise of protected disability-related rights.

Defendant also subjected Plaintiff's disability-related leave to separate scrutiny outside ordinary leave administration while Plaintiff's accommodation request remained active. Rather than simply process leave through ordinary channels, Defendant isolated Plaintiff's leave use for targeted review, separate summary treatment, revision, and circulation in a manner that cast approved disability-related leave as suspicious or misconduct-oriented. That sequence plausibly shows more than routine administrative review. It shows that Defendant imposed special tracking, special documentary burdens, and special scrutiny around the same disability-related leave and accommodation activity for which Plaintiff was seeking statutory protection.

The challenged conduct also plausibly constitutes interference. Defendant blocked or restricted practical alternatives that would have allowed Plaintiff to continue working during flare episodes, including situational telework and related flexibility, forced Plaintiff to use leave instead, and then made the use of that leave more difficult and burdensome by imposing recurring medical-certification demands and targeted scrutiny. In this way, Defendant did not merely respond to Plaintiff's exercise of disability-related rights. It made the exercise of those rights more difficult, more coercive, and more professionally risky. Section 12203(b) and 29

C.F.R. § 1630.12 prohibit that kind of coercive and burdensome interference with the exercise of protected disability rights.

The same conduct also plausibly constitutes retaliation. A reasonable employee could be dissuaded from requesting accommodation, using disability-related leave, objecting to unlawful restrictions, or continuing to press an accommodation dispute if the result would be increased attendance burdens, forced leave use, repeated medical-certification demands, special leave audits, shifting status restrictions, and escalating scrutiny. Under *Burlington Northern* and *Mogenhan*, the pleaded conduct is sufficient to support a retaliation claim because it plausibly imposed consequences that could chill further protected activity.

Retaliatory and interfering escalation continued after Defendant formally acknowledged Plaintiff's disability and while the accommodation dispute remained unresolved. Plaintiff objected to Defendant's certification demand and challenged Defendant's handling of the accommodation request. Defendant nonetheless continued advancing accommodation-denial activity through management, Human Capital, counsel, and senior leadership while keeping leave scrutiny and related restrictions active. Defendant then escalated further by placing Plaintiff on investigative leave during the same period. At the pleading stage, that sequence plausibly supports the inference that the suspension was part of the same escalating response to Plaintiff's accommodation activity, disability-related leave use, and objections to unlawful disability-related restrictions.

The challenged conduct is attributable to Defendant. The actions described above were not isolated acts by a single supervisor. They involved management, Human Capital, counsel, and senior officials who were aware of Plaintiff's medical condition, accommodation request, and disability-related leave while the certification demand, leave-focused scrutiny,

74

accommodation-denial process, and suspension-related decisions were occurring. The pleaded facts therefore support the inference that Defendant itself retaliated against Plaintiff and interfered with Plaintiff's exercise of protected disability rights.

As a direct and foreseeable result of Defendant's retaliatory and interfering conduct, Plaintiff experienced increased attendance burdens, disability-related leave restrictions, heightened scrutiny, instability in the accommodation process, and suspension during an active effort to obtain protection for a chronic inflammatory disability. The same conduct increased stress and workplace pressure while Defendant knew that Plaintiff's condition was stress-reactive and aggravated by physical attendance conditions, thereby worsening Plaintiff's medical state during the same period.

Accordingly, Defendant violated the Rehabilitation Act and the ADA standards it incorporates by retaliating against Plaintiff for engaging in protected disability-related activity and by coercing, burdening, harassing, and interfering with Plaintiff's exercise of protected disability rights, in violation of 29 U.S.C. §§ 791, 794, 794(d), and 794a(a)(1); 42 U.S.C. § 12203; and 29 C.F.R. §§ 1614.203 and 1630.12.

### COUNT III – Disparate Treatment Based on Disability and Disability-Related Manifestations
### (Rehabilitation Act of 1973, 29 U.S.C. §§ 791, 794, 794(d), 794a(a)(1); 29 C.F.R. §§ 1614.203, 1630.4)

Plaintiff realleges and incorporates all preceding allegations, statements, and facts as if fully set forth herein.

The Rehabilitation Act prohibits a federal agency from treating a qualified employee differently because of disability or because of conduct and circumstances that are manifestations

of disability. 29 U.S.C. §§ 791, 794, 794(d), 794a(a)(1); 29 C.F.R. §§ 1614.203, 1630.4. This count challenges Defendant's selective decisionmaking to single Plaintiff out and to treat Plaintiff's disability-related absences, flare-related limitations, and accommodation-related circumstances as grounds for special suspicion, altered status, and negative employment action. It is distinct from Plaintiff's failure-to-accommodate claim because it addresses discriminatory treatment, and it is distinct from Plaintiff's terms-and-conditions claim because it challenges the agency's decisions to target Plaintiff and recast disability manifestations as a basis for adverse treatment. See Adeyemi v. District of Columbia, 525 F.3d 1222, 1226–27 (D.C. Cir. 2008).

P          laintiff was a qualified individual with a disability at all relevant times. Defendant formally recognized that Plaintiff had a qualifying disability and knew that Plaintiff's flare-related absences, work limitations, and need for flexibility were connected to that condition. Before the challenged actions described below, Plaintiff had not been placed on a documented probationary process, had not been placed on a formal performance-improvement process, and had not been given finalized performance standards establishing any neutral, preexisting basis for the selective actions later imposed on him.

After Plaintiff began using flare-related sick leave and disclosed disability-related limitations, Defendant began treating Plaintiff differently from ordinary employees by converting disability-related circumstances into grounds for suspicion and selective action. Rather than treat Plaintiff's flare-related leave and workplace limitations as matters requiring accommodation and lawful management of disability-related needs, Defendant treated those same manifestations as reasons to single Plaintiff out for heightened concern, scrutiny, and negative decisionmaking. Defendant thereby transformed the consequences of Plaintiff's disability into a basis for differential treatment.

76

Defendant also subjected Plaintiff to disability-based restrictions through an asserted status framework that was never shown to have been validly or formally imposed before management began enforcing it against Plaintiff. Defendant invoked shifting and conflicting explanations for the same restrictions, including an asserted probationary status, attendance-related concerns, and a later "extended period of performance." Those explanations did not operate independently. They reflected Defendant's use of unstable and changing rationales to justify singling Plaintiff out after Plaintiff's disability-related leave and flare-related limitations became a management concern. The pleaded facts support the inference that these asserted status labels were used not as neutral personnel classifications, but as tools to impose and preserve restrictions tied to Plaintiff's disability-related circumstances.

Defendant likewise treated Plaintiff's disability-related leave as a basis for separate scrutiny outside ordinary leave administration. Rather than rely on the ordinary leave system and ordinary supervisory review, Defendant isolated Plaintiff's leave use for targeted review, compilation, revision, and special suspicion while accommodation and related employment decisions were being developed. The pleaded facts support the inference that this separate review process was not routine recordkeeping. It was selective treatment directed at Plaintiff because Defendant had made Plaintiff's flare-related absences into a subject of internal concern and negative decisionmaking. That selective treatment is especially probative because the leave at issue was connected to the same medical condition Defendant later acknowledged as a qualifying disability.

Defendant's selective treatment also extended into its handling of Plaintiff's employment status and evaluative framework. During the same period in which Plaintiff's accommodation request remained pending, Defendant shifted from one asserted status rationale to another, fixed

an evaluation endpoint, and moved toward performance-related consequences while the relevant evaluative framework was still being defined. These actions did not reflect the neutral application of a stable, preexisting system. As pleaded, they reflected selective decisionmaking directed at Plaintiff after disability-related leave and accommodation activity had already made Plaintiff the subject of management concern.

This count does not depend only on the theory that Defendant failed to accommodate Plaintiff. It also rests on Defendant's selective use of Plaintiff's disability and disability-related manifestations, especially flare-related leave, as a basis for suspicion, undocumented status changes, special review, and negative employment decisionmaking. Nor is this count limited to the day-to-day burdens under which Plaintiff had to work. Those burdens are addressed separately. Here, Plaintiff challenges Defendant's discriminatory decisions to single Plaintiff out and to treat disability manifestations as a reason for negative action.

The challenged conduct is attributable to Defendant. The relevant actions involved officials who knew of Plaintiff's medical condition, accommodation request, and disability-related leave while the selective scrutiny, shifting status rationales, leave-focused review, and performance-related decisions were occurring. The pleaded facts therefore support the inference that the disparate treatment was not accidental or isolated, but part of a coordinated response to Plaintiff's disability-related circumstances.

As a direct and foreseeable result of this disparate treatment, Plaintiff was singled out for disability-centered suspicion, subjected to selective negative decisionmaking, and forced to continue employment under a framework in which manifestations of Plaintiff's medical condition were treated as grounds for heightened scrutiny, altered status, and adverse action. That discriminatory treatment contributed to the worsening of Plaintiff's working environment,

78

the destabilization of Plaintiff's medical condition, and the broader deterioration described in the preceding allegations.

Accordingly, Defendant discriminated against Plaintiff because of disability and disability-related manifestations, in violation of the Rehabilitation Act, 29 U.S.C. §§ 791, 794, 794(d), and 794a(a)(1), and 29 C.F.R. §§ 1614.203 and 1630.4.

### COUNT IV – Disparate Terms and Conditions of Employment Based on Disability

### (Rehabilitation Act, 29 U.S.C. § 794; 29 C.F.R. §§ 1630.4, 1614.203)

Plaintiff realleges and incorporates all preceding allegations, statements, and facts as if fully set forth herein.

The Rehabilitation Act prohibits a federal agency from subjecting a qualified employee with a disability to materially different terms, conditions, or privileges of employment because of disability or disability-related manifestations. 29 U.S.C. §§ 791, 794, 794(d), 794a(a)(1); 29 C.F.R. §§ 1614.203, 1630.4. This count challenges the altered conditions under which Plaintiff was required to work after Defendant learned of Plaintiff's disability-related limitations and flare-related absences, including increased in-office attendance, individualized monitoring and attendance restrictions, special sick-leave certification demands, forced unpaid overtime, and a disputed probationary or extended-performance framework imposed during the same period that Plaintiff's accommodation request and medical limitations were known to the agency.

Plaintiff was a qualified individual with a disability at all relevant times. Defendant formally confirmed on October 14, 2022 that Plaintiff's medical documentation established a qualifying disability. Before the altered conditions described below were imposed, Plaintiff had not been placed on a formal performance-improvement process, had not received a written probation

79

notice, and had not been given finalized performance standards establishing any preexisting basis for the new burdens later imposed on him.

In early September 2022, after Plaintiff began using flare-related sick leave, Defendant required Plaintiff to attend the office four days per week rather than under the agency's ordinary hybrid schedule. Defendant later tied that four-day in-office requirement to Plaintiff's attendance, flare-related absences, and supposed leave abuse. Defendant also invoked shifting explanations for the same restriction, including an asserted probationary status and a later "extended period of performance," even though the framework being applied to Plaintiff remained unstable and disputed. The chronology alleged here supports the inference that the increased attendance burden was imposed in response to Plaintiff's disability-related leave usage rather than as part of a neutrally fixed workplace condition established from the outset.

The increased attendance obligation was accompanied by other individualized burdens that materially changed the conditions under which Plaintiff had to perform his job. Defendant required Plaintiff to maintain a customer matrix, provide enhanced oral and written status reporting regarding daily work, and operate under a disputed status framework while management and Human Capital were still sorting out the asserted basis and mechanics of that framework. These were not ordinary background expectations. They imposed heightened reporting, scrutiny, and monitoring obligations on Plaintiff beyond the agency's ordinary hybrid arrangement and beyond the conditions applied to other employees.

Plaintiff was also subjected to a special sick-leave certification requirement tied to disability-related absences. Defendant required Plaintiff to provide medical certification for sick leave taken on mandatory in-office days and later tied that requirement to Plaintiff's history of flare-related sick leave and purported attendance concerns. No formal leave-restriction process

80

preceded that demand, and the requirement was later withdrawn after Plaintiff cited the governing sick-leave regulation. The pleaded facts therefore support the inference that this was not a neutral leave-administration measure, but a targeted burden imposed on Plaintiff during the same period in which Plaintiff's disability and accommodation request were known to Defendant.

Defendant also imposed forced unpaid overtime as part of the altered conditions under which Plaintiff was required to work. Plaintiff was required to devote additional uncompensated time and effort to the heightened reporting, monitoring, and evaluative demands Defendant had imposed, including work associated with the customer matrix, increased status reporting, and other intensified oversight obligations. In context, that unpaid extra work was not a neutral operational requirement. It functioned as an additional burden flowing from the same disability-centered scrutiny and altered framework that Defendant had imposed after Plaintiff's flare-related absences and accommodation activity became the subject of management concern. By requiring Plaintiff to perform extra uncompensated work under these conditions, Defendant further worsened the terms and conditions of Plaintiff's employment.

The altered working conditions were further shaped by a midstream evaluative framework that was still being developed while Defendant was already imposing attendance, monitoring, leave-related, and overtime-related burdens on Plaintiff. Management and Human Capital discussed Plaintiff's asserted probationary or extended-performance status, the timing of the performance period, and related evaluative measures while accommodation processing remained active and while performance standards and related materials were still being assembled. In this count, those facts are relevant because they describe the employment conditions under which Plaintiff was required to continue working: not a stable and previously

81

defined framework, but a shifting one imposed during an active accommodation dispute and alongside disability-related restrictions and scrutiny.

Taken together, these conditions materially altered the way Plaintiff was required to work. Plaintiff was subjected to materially more burdensome terms and conditions of employment than the agency's ordinary hybrid structure. Defendant placed Plaintiff under a heightened in-office attendance requirement, enhanced attendance and monitoring obligations, a special doctor's-note requirement tied to disability-related leave, forced unpaid overtime, and a disputed performance-status framework that remained unsettled even while it was being enforced against him. Defendant's later explanations for the same four-day in-office requirement tied that restriction directly to Plaintiff's attendance, flare-related absences, and supposed leave abuse, confirming that the asserted probation label, the leave-based restrictions, and the related burdens were not separate developments but part of the same response to Plaintiff's disability-related leave usage.

Defendant then reinforced those altered conditions by blocking practical alternatives to leave use, punishing Plaintiff for later disability-related leave, proceeding with performance-related consequences unsupported by stable standards, failing to engage in a genuine interactive process, and continuing to enforce the same burdens even after recognizing Plaintiff's qualifying disability. These were not neutral workplace conditions. They were the concrete work rules, presence requirements, monitoring obligations, uncompensated labor demands, and evaluative pressures under which Plaintiff was forced to continue working after Defendant knew of Plaintiff's disability-related limitations, and they fundamentally altered the terms, conditions, and privileges of Plaintiff's employment.

82

These altered conditions caused concrete harm. They required Plaintiff to work under increased in-office attendance obligations and related burdens that exposed Plaintiff to the same triggers identified in Plaintiff's medical documentation, including friction, moisture, commuting strain, and sustained psychological stress. They also required Plaintiff to perform additional uncompensated work while under intensified scrutiny and unstable employment conditions. During this period, Plaintiff's previously controlled condition destabilized and required further medical treatment, including injections and surgical procedures, as alleged in the preceding factual sections.

Accordingly, Defendant discriminated against Plaintiff in the terms, conditions, and privileges of employment because of disability and disability-related manifestations, in violation of the Rehabilitation Act, 29 U.S.C. §§ 791, 794, 794(d), and 794a(a)(1), and 29 C.F.R. §§ 1614.203 and 1630.4.

## COUNT V – Disability-Based Hostile Work Environment

**(Rehabilitation Act, 29 U.S.C. § 794; 29 U.S.C. § 794a(a)(1); 29 C.F.R. § 1614.203)**

Plaintiff realleges and incorporates all preceding allegations, statements, and facts as if fully set forth herein.

The Rehabilitation Act prohibits a federal employer from subjecting a qualified employee with a disability to discriminatory intimidation, harassment, and abuse that is sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment. 29 U.S.C. §§ 791, 794, 794(d), 794a(a)(1); 42 U.S.C. § 12112; 29 C.F.R. § 1614.203; Harris v. Forklift Sys., Inc., 510 U.S. 17, 21–23 (1993); Baloch v. Kempthorne, 550 F.3d 1191, 1201 (D.C. Cir. 2008).

83

███████████████████████████████████████████████

████████████████████████████████ Defendant recognized that Plaintiff

had a qualifying disability and knew that Plaintiff's need for flare-related telework, flexibility,

and leave was connected to that condition. 29 U.S.C. §§ 791, 794(d); 42 U.S.C. § 12102; 29

C.F.R. §§ 1614.203, 1630.2(g), (i), (j).

After Plaintiff's disability-related absences and limitations became known, Defendant

subjected Plaintiff to an escalating pattern of disability-centered scrutiny, restrictions, and

punishment. Defendant treated Plaintiff's flare-related telework and sick leave, which

management understood to be connected to disease flare-ups and had approved when they

occurred, as the basis for a later misconduct narrative. Defendant thus converted known and

approved manifestations of Plaintiff's disability into supposed attendance problems, leave

suspicion, and alleged misconduct. That conduct was not neutral workplace administration. It

was the repeated use of Plaintiff's disability manifestations as grounds for pressure and

discipline. 29 U.S.C. §§ 791, 794, 794(d); 42 U.S.C. § 12112(a), (b)(1), (b)(3), (b)(5)(A).

Defendant further worsened the environment by using those asserted attendance concerns

to impose an unofficial punitive status on Plaintiff while Plaintiff was seeking reasonable

accommodation and even after Defendant had approved Plaintiff's qualifying disability. That

status was described through shifting labels and rationales, but it carried the same practical

effect: special attendance restrictions, heightened in-office presence requirements, leave-based

scrutiny, and intensified oversight imposed on Plaintiff and not neutrally applied as part of

ordinary workplace operations. Defendant thereby made Plaintiff's disability-related leave use

84

the trigger for a more burdensome set of work conditions and restrictions. 42 U.S.C. § 12112(a), (b)(1), (b)(3), (b)(5)(A); 29 C.F.R. §§ 1614.203, 1630.2(o), 1630.9.

Defendant also cut off or restricted practical alternatives that would have allowed Plaintiff to remain productive during flare episodes without repeated resort to sick leave. Rather than permit situational telework, flexible or alternating arrival times, and other measures responsive to active symptoms, Defendant forced Plaintiff to use sick leave and then treated that resulting leave as improper, suspicious, or deserving of punishment. In this way, Defendant created a no-win cycle: it blocked alternatives that would have reduced Plaintiff's need for leave, increased Plaintiff's reliance on leave, and then used that same leave against Plaintiff as though it were evidence of misconduct. Such conduct directly tied the conditions of Plaintiff's employment to the manifestations of Plaintiff's disability. 42 U.S.C. § 12112(b)(5)(A); 29 C.F.R. §§ 1630.2(o), 1630.9.

The hostile environment intensified after Defendant recognized Plaintiff's qualifying disability. Rather than stopping the punitive treatment of disability-related absences, Defendant maintained the restrictions already imposed, demanded repeated medical support for subsequent flare-related leave, denied effective accommodation, and continued treating Plaintiff's need for leave and workplace flexibility as a disciplinary problem. Defendant showed no sign that it intended to stop punishing Plaintiff for needing leave related to Plaintiff's disability. Instead, each subsequent use of disability-related leave exposed Plaintiff to renewed scrutiny, additional restrictions, and further punishment. 29 U.S.C. §§ 791, 794, 794(d); 42 U.S.C. § 12112(a), (b)(1), (b)(5)(A); 29 C.F.R. §§ 1614.203, 1630.9.

Defendant compounded that environment by selectively reframing Plaintiff's approved telework and leave usage as part of an attendance-and-misconduct narrative. Rather than treat

85

Plaintiff's flare-related absences in their actual medical context, Defendant preserved and used an accusatory version of those events that stripped away their approval status and disability-related basis. That reframing reinforced the message already conveyed by Defendant's restrictions and denials: that Plaintiff's disability manifestations would be treated as a workplace offense rather than a protected medical reality. 42 U.S.C. § 12112(a), (b)(1), (b)(3), (b)(5)(A).

At the same time, Defendant did not confine Plaintiff's disability-related issues to a neutral accommodation process. While Plaintiff was seeking accommodation, Defendant simultaneously maintained the restrictions tied to Plaintiff's flare-related absences, increased disability-related leave restrictions, denied effective workplace flexibility, and advanced overlapping status- and performance-related pressure connected to the same disability manifestations for which Plaintiff sought protection. The overlap among these actions magnified the severity of the environment because Plaintiff was required to continue working under converging attendance, leave, and employment pressures all tied to Plaintiff's disease-related limitations. 29 U.S.C. §§ 791, 794, 794(d), 794a(a)(1); 42 U.S.C. § 12112(a), (b)(1), (b)(5)(A).

This conduct was severe and pervasive under the totality of the circumstances. It was repeated, escalating, and directly tied to Plaintiff's disability, flare-related absences, accommodation request, and use of disability-related leave. It altered the conditions of Plaintiff's employment by subjecting Plaintiff to a recurring regime in which each flare episode could trigger renewed scrutiny, additional restrictions, more documentation demands, and further punishment. The conduct also unreasonably interfered with Plaintiff's work because Defendant denied the measures that would have allowed Plaintiff to continue working during symptoms, forced increased use of leave instead, and then held that leave against Plaintiff. Harris, 510 U.S. at 21–23; Baloch, 550 F.3d at 1201.

Defendant did not administer Plaintiff's working conditions through clear and consistent explanations. Instead, it repeatedly enforced disability-related restrictions while providing shifting, incomplete, or conflicting rationales for them, later repackaging prior denials and preexisting arrangements as accommodation offers. During the accommodation process, Defendant also interfered with Plaintiff's ability to perform his duties more generally by removing permissions around September 27 that were required for Plaintiff's system-administration work and by failing, from late August through October 28, to grant the permissions needed for Plaintiff to perform newly assigned OSC.gov management duties, while nonetheless maintaining that Plaintiff would be evaluated on those duties. In context, that pattern contributed to the hostile environment by forcing Plaintiff to navigate disability-related restrictions and employment consequences through a process marked by concealment, inconsistency, withheld tools, and continuing uncertainty.

Defendant's handling of both accommodation denials also formed part of the hostile environment. Defendant did not merely deny Plaintiff's request for full-time telework once and leave the matter there. It twice rejected the requested accommodation while presenting compromise proposals that did not remove the barriers identified in Plaintiff's medical documentation and did not permit Plaintiff to manage flare episodes in the manner his condition required. The first denial repackaged the agency's ordinary schedule as if it were an accommodation. The second again refused full-time telework and substituted measures that still required in-office attendance under the same conditions that triggered Plaintiff's need for leave and worsened symptoms, while also narrowing Plaintiff's practical leave flexibility by recasting preexisting unscheduled leave use as a capped accommodation. These denials were not isolated administrative events. They reinforced the ongoing message that Plaintiff's medically

87

documented limitations would not be meaningfully accommodated and that each request for protection would instead be met with partial measures, continued exposure to known triggers, and further pressure to work under conditions that aggravated the disability. In that setting, the repeated denials and ineffective compromise offers contributed to the cumulative atmosphere of instability, hostility, and disability-centered pressure that altered the conditions of Plaintiff's employment.

The environment was both objectively and subjectively abusive. Plaintiff understood that the same condition for which Plaintiff sought accommodation was being used to justify heightened attendance restrictions, repeated leave-based suspicion, shifting status labels, and continued punishment. Because Plaintiff's condition is aggravated by sustained stress and adverse physical conditions, Defendant's repeated restrictions, denials, scrutiny, and uncertainty foreseeably worsened Plaintiff's condition and interfered with Plaintiff's ability to remain employed. Defendant's conduct therefore did not amount to ordinary workplace friction or routine supervision. It constituted a sustained course of disability-based hostility that altered the terms, conditions, and privileges of Plaintiff's employment. 29 U.S.C. §§ 791, 794, 794(d), 794a(a)(1); 42 U.S.C. § 12112(a), (b)(1), (b)(5)(A); 29 C.F.R. §§ 1614.203, 1630.9.

As a direct and proximate result of Defendant's disability-based hostile work environment, Plaintiff suffered loss of employment conditions protected by the Rehabilitation Act, emotional distress, worsening of Plaintiff's medical condition, and other compensable harm authorized by law.

**COUNT VI – Disability-Related Constructive Discharge**
**(Rehabilitation Act, 29 U.S.C. §§ 791, 794, 794(d), 794a(a)(1); 42 U.S.C. § 12112; 29 C.F.R.**
**§ 1614.203)**

Plaintiff realleges and incorporates all preceding allegations as if fully set forth herein.

The Rehabilitation Act prohibits a federal agency from forcing a qualified employee with a disability to resign by making working conditions so intolerable that a reasonable person in the employee's position would feel compelled to leave. A constructive-discharge claim requires discriminatory working conditions so severe that resignation becomes a fitting and foreseeable response, not merely an unpleasant workplace or a single disputed employment action. Pennsylvania State Police v. Suders, 542 U.S. 129, 141–43 (2004); Green v. Brennan, 578 U.S. 547, 555–56 (2016). Those standards apply to disability-based discrimination claims brought by federal employees under the Rehabilitation Act. 29 U.S.C. §§ 791, 794(d), 794a(a)(1); 29 C.F.R. § 1614.203.

███████████████████████████████████████████████████████████

████ Defendant also knew that Plaintiff sought workplace flexibility and accommodation because of those limitations, yet it responded not by removing barriers, but by escalating restrictions, scrutiny, and pressure tied to the very manifestations of Plaintiff's disability. 29 U.S.C. §§ 791, 794, 794(d); 42 U.S.C. § 12112(a), (b)(1), (b)(5)(A); 29 C.F.R. §§ 1614.203, 1630.2, 1630.9. Plaintiff's working conditions became intolerable through an escalating and coordinated sequence of disability-centered restrictions, forced leave use, denial of effective accommodation, and overlapping employment pressure. After Plaintiff began experiencing flare-related absences and sought accommodation, Defendant imposed special attendance restrictions, denied situational telework during flare episodes, required Plaintiff to use leave rather than work remotely when symptoms prevented in-office attendance, imposed additional certification

89

burdens tied to Plaintiff's sick leave, and maintained those conditions while Plaintiff's accommodation request remained unresolved. Rather than address Plaintiff's limitations through a lawful and effective accommodation process, Defendant treated Plaintiff's disability-related absences as the basis for heightened restrictions and punitive scrutiny. 42 U.S.C. § 12112(a), (b)(1), (b)(5)(A); 29 C.F.R. §§ 1614.203, 1630.9.

Those conditions became more intolerable because Defendant did not merely deny accommodation and leave the workplace unchanged. Instead, Defendant maintained the attendance obligations and physical workplace demands that aggravated Plaintiff's condition, blocked alternatives that would have allowed Plaintiff to remain productive during flare episodes, forced Plaintiff into greater reliance on sick leave, and then treated that resulting leave use as suspicious, improper, or deserving of punishment. Defendant thus created a no-win cycle in which Plaintiff could either report to the office under conditions that worsened Plaintiff's disease or use leave and face renewed scrutiny and escalating consequences for doing so. That pattern materially intensified the pressure on Plaintiff to resign because it made continued employment incompatible with safe management of Plaintiff's disability. 42 U.S.C. § 12112(a), (b)(1), (b)(3), (b)(5)(A); 29 C.F.R. §§ 1630.2(o), 1630.9. The intolerability of Plaintiff's working conditions was further heightened by Defendant's use of shifting status labels, leave-based suspicion, and overlapping employment measures to increase pressure on Plaintiff's continued employment.

While Plaintiff's accommodation request remained pending, Defendant maintained the same disability-related attendance restrictions, continued punishing Plaintiff for later flare-related leave use, and advanced status-based, leave-based, and performance-related pressure tied to the same disability manifestations for which Plaintiff had sought protection. Defendant's

90

conduct communicated that Plaintiff's need for leave, flexibility, and accommodation would continue to be treated as a workplace problem and as a basis for escalating adverse action rather than as a protected medical reality requiring lawful accommodation. 29 U.S.C. §§ 791, 794, 794(d), 794a(a)(1); 42 U.S.C. § 12112(a), (b)(1), (b)(5)(A). By the final period before Plaintiff's resignation, Defendant had given Plaintiff no reasonable basis to believe that the discriminatory course of conduct would stop. Defendant had already denied effective accommodation, maintained the attendance and leave burdens tied to Plaintiff's disability, continued using Plaintiff's need for leave as a source of suspicion and punishment, and layered additional employment instability onto that same pattern.

Under those circumstances, a reasonable employee in Plaintiff's position could conclude that remaining employed would mean continued exposure to a workplace that was aggravating the disability itself while repeatedly converting the manifestations of that disability into grounds for escalating restrictions, scrutiny, and negative employment action. Suders does not require an employee to wait for the final possible disciplinary step before resigning once discriminatory conditions have already become objectively intolerable, and Green confirms that constructive discharge turns on whether the employee was effectively compelled to resign. Suders, 542 U.S. at 141–43; Green, 578 U.S. at 555–56. Plaintiff resigned on November 18, 2022. In the circumstances alleged throughout this Complaint, that resignation was not a voluntary departure from an ordinary workplace dispute. It was the foreseeable culmination of a sustained discriminatory course of conduct in which Defendant denied effective accommodation, blocked alternatives to disability-related leave, forced Plaintiff to rely on leave and then punished Plaintiff for using it, maintained medically harmful restrictions, and subjected Plaintiff to continuing pressure tied to the same condition for which Plaintiff sought protection. A

91

reasonable person in Plaintiff's position would have felt compelled to resign. Suders, 542 U.S. at 141–43; Green, 578 U.S. at 555–56. Accordingly, Defendant constructively discharged Plaintiff in violation of the Rehabilitation Act. 29 U.S.C. §§ 791, 794, 794(d), 794a(a)(1); 42 U.S.C. § 12112; 29 C.F.R. § 1614.203.

### COUNT VII – Failure to Protect Medical Confidentiality

### (Rehabilitation Act, 29 U.S.C. §§ 794, 794(d); 29 C.F.R. §§ 1630.14, 1630.12(b))

Plaintiff realleges and incorporates all preceding allegations, statements, and facts as if fully set forth herein.

The Rehabilitation Act incorporates the ADA standards governing the confidentiality of employee medical information obtained through disability-related inquiries and the reasonable-accommodation process. Under those standards, medical information obtained from an employee must be collected and maintained on separate forms and in separate medical files, treated as confidential medical information, and disclosed only in narrow need-to-know circumstances, including to supervisors and managers regarding necessary restrictions or accommodations, to first-aid and safety personnel when appropriate, and to government officials investigating compliance. 29 U.S.C. §§ 791, 794(d), 794a(a)(1); 42 U.S.C. § 12112(d); 29 C.F.R. § 1630.14(c). Those confidentiality protections apply independently of whether the employer ultimately grants or denies the requested accommodation. The D.C. Circuit has recognized that unauthorized disclosure of protected medical information may violate the Rehabilitation Act's incorporated confidentiality rules as a distinct claim. Doe v. U.S. Postal Serv., 317 F.3d 339, 343–45 (D.C. Cir. 2003).

In connection with Plaintiff's reasonable-accommodation request, Defendant obtained medical information describing Plaintiff's condition, its functional effects, the workplace and

92

environmental triggers that aggravated it, and the accommodation sought to reduce those effects. Once Defendant received that information through the accommodation process, it was protected medical information subject to the confidentiality requirements incorporated into the Rehabilitation Act. 29 U.S.C. §§ 791, 794(d); 42 U.S.C. § 12112(d); 29 C.F.R. § 1630.14(c). Despite those obligations, Defendant disseminated Plaintiff's medical and accommodation information beyond the narrow implementation-related purposes permitted by law. As alleged above, Plaintiff's medical information and accommodation materials were circulated among officials outside the limited channels necessary to implement accommodations or restrictions, including individuals involved in broader decisions concerning Plaintiff's attendance, leave, accommodation denial, performance-related measures, and other employment actions. Plaintiff alleges that this circulation exceeded the narrow disclosure categories permitted by 29 C.F.R. § 1630.14(c), because the information was not confined to those who needed it solely to carry out necessary restrictions or accommodations. 29 C.F.R. § 1630.14(c)(1).

Defendant also used Plaintiff's protected medical information for purposes inconsistent with the confidentiality rule. Rather than confining the information to the accommodation process and the limited need-to-know uses permitted by regulation, Defendant used or allowed it to be used in connection with decisions concerning Plaintiff's attendance restrictions, leave-related scrutiny, accommodation denial, and overlapping employment pressure tied to the same disability-related limitations described in Plaintiff's medical records. The confidentiality rule does not permit an agency to obtain medical information through the accommodation process and then use that information as part of a broader internal strategy for restricting, scrutinizing, or disadvantaging the employee outside the narrow purposes recognized by the regulation. 29 C.F.R. § 1630.14(c); 29 U.S.C. § 794(d). This count is not based merely on the denial of

93

accommodation. It is based on Defendant's separate statutory duty to protect the confidentiality of medical information obtained through the accommodation process and to limit both disclosure and use of that information. That duty is independent. An employer may therefore violate the Rehabilitation Act by improperly disclosing or misusing protected medical information even where the accommodation request itself is separately disputed. Doe, 317 F.3d at 343–45. The unauthorized dissemination and misuse of Plaintiff's medical information caused distinct harm. Plaintiff was required to disclose sensitive medical information in order to seek accommodation for a chronic and painful condition. Defendant then allowed that information to circulate among officials involved in decisions affecting Plaintiff's employment conditions, thereby depriving Plaintiff of the confidentiality protections guaranteed by federal disability law. Because Defendant also knew from the medical information itself that Plaintiff's condition was aggravated by sustained stress and workplace conditions, Defendant's misuse of that information foreseeably intensified the very harms that the accommodation process was supposed to address. 29 U.S.C. §§ 791, 794, 794(d), 794a(a)(1); 42 U.S.C. § 12112(d); 29 C.F.R. § 1630.14(c).

Defendant's own handling of the accommodation process also supports the inference that Plaintiff's medical and accommodation information was disclosed beyond the limited need-to-know channel. Under the agency's accommodation framework as alleged in this Complaint, once disability status was determined, the supervisor was the decision-maker for selecting the accommodation. Yet Defendant cannot plausibly treat Ahmad, Beckett, Massey, Baxter and all others as being the operative accommodation decision-maker while also justifying the repeated inclusion of multiple executives on accommodation-denial emails, draft Form 61 exchanges, and related communications as equally necessary to that same function. The record instead shows that both officials were included while counsel and Human Capital were also reviewing and

94

shaping the accommodation outcome. That pattern supports the inference that Plaintiff's disability-related information was not confined to a single authorized decision-maker and narrowly necessary participants, but was circulated more broadly than required for accommodation implementation.

Defendant's conduct also departed from the federal-sector standards governing disability discrimination and accommodation confidentiality. Federal-sector Rehabilitation Act claims are governed by the ADA standards incorporated through 29 U.S.C. § 794(d) and implemented through 29 C.F.R. § 1614.203. Defendant's dissemination and use of Plaintiff's medical information outside the narrow confidentiality framework alleged here violated those standards. 29 U.S.C. §§ 791, 794, 794(d), 794a(a)(1); 29 C.F.R. § 1614.203. Accordingly, Defendant violated the confidentiality protections incorporated into the Rehabilitation Act by disclosing Plaintiff's disability-related medical information beyond the limited categories permitted by 29 C.F.R. § 1630.14(c) and by using that information for purposes inconsistent with the accommodation-confidentiality framework. Defendant is therefore liable under 29 U.S.C. §§ 791, 794, 794(d), and 794a(a)(1); 42 U.S.C. § 12112(d); and 29 C.F.R. §§ 1614.203 and 1630.14(c).

**COUNT VIII – Improper Disability-Related Inquiries and Medical Certification Demands (Rehabilitation Act of 1973, 29 U.S.C. §§ 791, 794, 794(d), 794a(a)(1); 42 U.S.C. § 12112(d); 29 C.F.R. §§ 1614.203, 1630.14)**

Plaintiff realleges and incorporates all preceding allegations, statements, and facts as if fully set forth herein.

The Rehabilitation Act incorporates the ADA standards governing disability-related inquiries and medical examinations of employees. After employment begins, an agency may not

95

require a medical examination or make disability-related inquiries unless the examination or inquiry is job-related and consistent with business necessity. An employer may request reasonable documentation in connection with a request for accommodation when the disability or need for accommodation is not obvious, but that inquiry must remain limited to information reasonably necessary to establish the existence of a covered disability and the need for accommodation. 29 U.S.C. §§ 791, 794(d), 794a(a)(1); 42 U.S.C. § 12112(d)(4)(A); 29 C.F.R. §§ 1614.203, 1630.14(c); EEOC Enforcement Guidance on Disability-Related Inquiries and Medical Examinations of Employees. Plaintiff requested reasonable accommodation and provided medical documentation describing Plaintiff's condition, its functional limitations, its triggers, and why telework was medically necessary. Defendant later acknowledged that Plaintiff had a qualifying disability. Once Defendant had received that information and recognized disability, any further medical inquiry had to remain narrowly tied to a legitimate business-necessity basis rather than generalized attendance concern, suspicion arising from disability-related leave, or a desire to impose extra burdens on Plaintiff's future leave use. 29 U.S.C. §§ 791, 794(d); 42 U.S.C. § 12112(d)(4)(A); 29 C.F.R. § 1630.14(c).

Despite that limitation, Defendant imposed an additional and recurring medical-certification demand tied to Plaintiff's disability-related absences. As alleged above, Defendant required Plaintiff to produce medical certification for later sick-leave episodes based on Plaintiff's attendance history and use of flare-related leave. Plaintiff alleges that those demands were not grounded in an individualized determination that Plaintiff was unable to perform essential job functions or posed a direct threat, but instead were imposed because Plaintiff's disability-related leave had become a source of management suspicion and pressure. Under the ADA standards incorporated into the Rehabilitation Act, that is not a sufficient basis by itself for

96

repeated medical inquiries or recurring certification demands. 42 U.S.C. § 12112(d)(4)(A); 29 C.F.R. § 1630.14(c); EEOC Enforcement Guidance on Disability-Related Inquiries and Medical Examinations of Employees. This count is distinct from Plaintiff's accommodation and confidentiality claims. Plaintiff does not allege here merely that Defendant requested initial medical information to evaluate whether Plaintiff had a covered disability and required accommodation. Rather, Plaintiff alleges that after Plaintiff had already supplied substantive medical information and after Defendant had recognized disability, Defendant moved beyond a permissible accommodation inquiry and imposed repeated per-absence medical-certification demands tied to flare-related leave and attendance concerns without a properly limited business-necessity basis. That conduct plausibly exceeded the scope of lawful post-hire medical inquiry permitted by 42 U.S.C. § 12112(d)(4)(A). 42 U.S.C. § 12112(d)(4)(A); 29 C.F.R. § 1630.14(c).

The impropriety of the recurring certification demand is reinforced by the surrounding sequence alleged throughout this Complaint. Plaintiff's disability-related leave had already become the subject of heightened scrutiny, special restrictions, and suspicion. During that same period, Defendant maintained attendance burdens tied to Plaintiff's flare-related limitations, denied effective accommodation, and treated Plaintiff's need for leave as a workplace problem rather than a protected manifestation of disability. In that context, the repeated doctor's-note demand functioned not as a neutral medical inquiry supported by ordinary business necessity, but as an additional disability-related burden imposed on Plaintiff because of Plaintiff's flare-related absences and accommodation activity. 29 U.S.C. §§ 791, 794, 794(d), 794a(a)(1); 42 U.S.C. § 12112(d)(4)(A); 29 C.F.R. §§ 1614.203, 1630.14(c). The challenged conduct is attributable to Defendant. As alleged above, the recurring medical-certification demand was imposed as part of Defendant's response to Plaintiff's disability-related leave during an active accommodation

97

dispute and was not an isolated mistake divorced from agency decision-making. Plaintiff alleges that the demand formed part of the same broader course of conduct through which Defendant converted disability-related leave into a basis for restrictions, suspicion, and escalating employment pressure. 29 U.S.C. §§ 791, 794, 794(d), 794a(a)(1); 42 U.S.C. § 12112(d)(4)(A).

As a direct and foreseeable result of these improper disability-related medical demands, Plaintiff was subjected to additional burdens in using leave during flare episodes, increased pressure to forgo protected disability-related leave or accommodation, and heightened stress while managing a chronic inflammatory condition that Defendant knew was aggravated by stress. Those harms were distinct from the accommodation denial itself and flowed from Defendant's separate decision to require repeated medical certification without a sufficiently limited and lawful basis. 29 U.S.C. §§ 791, 794, 794(d), 794a(a)(1); 42 U.S.C. § 12112(d)(4)(A); 29 C.F.R. §§ 1614.203, 1630.14(c). Accordingly, Defendant violated the Rehabilitation Act and the ADA standards it incorporates by imposing improper disability-related inquiries and recurring medical-certification demands on Plaintiff in violation of 29 U.S.C. §§ 791, 794, 794(d), and 794a(a)(1); 42 U.S.C. § 12112(d); and 29 C.F.R. §§ 1614.203 and 1630.14.

**COUNT IX – Disability-Based Manipulation of the Performance Evaluation Process (Rehabilitation Act of 1973, 29 U.S.C. § 794; 29 U.S.C. § 794(d); 29 U.S.C. § 794a(a)(1); 29 C.F.R. §§ 1630.4, 1614.203)**

Plaintiff realleges and incorporates all preceding allegations, statements, and facts as if fully set forth herein.

This count does not challenge Defendant's performance administration as a free-standing procedural violation, nor does it rest on a mere disagreement with Defendant's performance judgments or the technical sufficiency of its procedures. Rather, Plaintiff alleges that Defendant

98

altered, accelerated, and manipulated the evaluative conditions governing Plaintiff's employment because of Plaintiff's disability-related absences, flare-related limitations, and accommodation activity, thereby imposing a specially manipulated and discriminatory evaluative regime as a condition of employment in violation of the Rehabilitation Act.

The Rehabilitation Act prohibits a federal employer from discriminating against a qualified individual with a disability in the terms, conditions, and privileges of employment. 29 U.S.C. §§ 791, 794, 794(d), 794a(a)(1); 29 C.F.R. §§ 1614.203, 1630.4. Those protected employment conditions include the framework through which an employee's work is judged, the standards by which performance is assessed, and the manner in which evaluative conclusions are developed and used. An employer therefore violates the Act when it subjects a disabled employee to a materially altered evaluative regime because of disability-related manifestations rather than legitimate, neutrally administered performance concerns.

Despite that knowledge, Defendant did not simply apply an existing and stable performance framework to Plaintiff. Instead, after Plaintiff's disability-related absences and accommodation activity became the subject of management concern, Defendant subjected Plaintiff to a specially altered evaluative environment.

As alleged above, Defendant imposed a disputed and shifting status framework on Plaintiff after Plaintiff's flare-related absences became known, tied that framework to attendance and leave-related concerns arising from disability manifestations, and then used that altered

99

framework to intensify scrutiny of Plaintiff's employment. Rather than proceed under a stable, preexisting, and neutrally administered evaluative structure, Defendant fixed an asserted evaluation period, advanced performance-related conclusions, and moved toward corrective or adverse consequences while the governing standards and framework were still being developed, revised, or clarified. In this way, Defendant placed Plaintiff under materially different evaluative conditions than those that ordinarily should have governed Plaintiff's employment.

That sequence supports the inference that Defendant did not identify legitimate performance concerns first and then apply an existing evaluative process. Instead, Defendant treated Plaintiff's disability-related absences, need for flexibility, and accommodation-related circumstances as the catalyst for constructing, altering, or accelerating the evaluative conditions under which Plaintiff would be judged. A performance framework ceases to function as a neutral employment condition when management shapes the framework itself in reaction to disability-related manifestations and then uses that altered structure to increase the risk of negative outcomes for the affected employee.

The discriminatory character of the altered evaluative conditions is reinforced by the surrounding facts alleged throughout this Complaint. The same period included disability-related attendance restrictions, denial of effective accommodation, repeated scrutiny of flare-related leave, shifting explanations for Plaintiff's status, and overlapping status-based and leave-based pressure tied to the same disability manifestations for which Plaintiff sought protection. In that context, the manipulation of Plaintiff's evaluative conditions did not occur in isolation. It formed part of the same coordinated course of conduct through which Defendant converted Plaintiff's disability-related limitations into grounds for heightened scrutiny, instability, and threatened employment consequences.

100

The altered evaluative framework materially affected the terms and conditions of Plaintiff's employment. By placing Plaintiff under a performance-related structure assembled, manipulated, or intensified in response to disability-related absences and accommodation activity, Defendant exposed Plaintiff to a discriminatory evaluative environment in which disability manifestations were more likely to be interpreted as performance failure and in which adverse consequences could be advanced without the normal stability, neutrality, and predictability expected of lawful employment conditions. The resulting framework increased employment pressure on Plaintiff, contributed to the hostile and coercive environment alleged elsewhere, and foreseeably aggravated Plaintiff's medical condition.

Accordingly, Defendant discriminated against Plaintiff in the terms, conditions, and privileges of employment by constructing, altering, accelerating, and administering Plaintiff's evaluative conditions in response to disability-related manifestations and accommodation activity rather than legitimate, neutrally administered performance concerns, in violation of the Rehabilitation Act, 29 U.S.C. §§ 791, 794, 794(d), and 794a(a)(1), and 29 C.F.R. §§ 1614.203 and 1630.4.

## V. Damages & Injuries

As a direct, foreseeable, and proximate result of Defendant's disability discrimination, failure to provide a reasonable accommodation, retaliation and interference with protected disability-related rights, disparate treatment, discriminatory terms and conditions of employment, hostile work environment, constructive discharge, improper disability-related medical-certification demands, disability-based misuse and manipulation of the performance-evaluation process, and failure to protect medical confidentiality, Plaintiff suffered substantial economic, non-pecuniary, medical, and equitable harm cognizable under the Rehabilitation Act.

101

Defendant's discriminatory conduct caused significant economic injury. Plaintiff's constructive discharge terminated his federal employment and caused the loss of salary, employment benefits, retirement accrual, and continuity of federal service. Plaintiff also lost the professional advancement, future earning capacity, and career trajectory associated with continued federal employment. These losses were the foreseeable result of Defendant's disability-based conduct and the resulting loss of Plaintiff's position.

Defendant's conduct also caused substantial non-pecuniary harm. Beginning in or around September 2022 and intensifying through Plaintiff's resignation in November 2022, Plaintiff experienced severe emotional distress, including persistent depression, clinically significant anxiety, chronic sleep disruption, impaired concentration, and sustained hypervigilance concerning discipline, job security, and workplace scrutiny. These were not ordinary workplace stresses. They arose from Defendant's repeated treatment of disability-related leave as suspicious or abusive, the imposition of escalating disability-centered restrictions, the circulation of Plaintiff's medical information, the denial of effective accommodation, the destabilization of Plaintiff's employment conditions, and the overlapping leave, attendance, performance, and disciplinary pressures described in this Complaint. When the agency first denied Plaintiff's reasonable-accommodation request, Plaintiff understood that OSC was not simply refusing accommodation, but was continuing to move forward with a performance process that had been assembled after disability-related leave restrictions had already been imposed and while his accommodation request and leave usage were under active scrutiny. By that point, leave scrutiny, accommodation processing, and performance-related actions were advancing together rather than through separate channels. Plaintiff therefore understood the performance process as part of the same course of conduct through which Defendant was

102

continuing to hinder and punish his use of disability-related leave despite having recognized him as a qualified individual with a disability.

At that point, Plaintiff became depressed and began to feel that there was no hope the agency would correct its conduct. Plaintiff later received a diagnosis of depression and continues to experience psychological effects from the conduct alleged here.

Defendant's conduct further caused pecuniary and medical harm. Because Defendant denied effective accommodation, imposed recurring disability-related burdens, and required



The harms described above are ongoing. Plaintiff continues to experience psychological and professional consequences from the loss of his federal employment and from the disability-based conduct alleged in this action. Plaintiff seeks all relief authorized by the Rehabilitation Act, including appropriate equitable relief such as reinstatement or front pay in lieu of reinstatement if warranted, back pay and associated benefits, declaratory and injunctive relief, attorney's fees and costs as authorized by law, and compensatory damages for pecuniary and non-pecuniary losses within the applicable statutory cap. Punitive damages are not sought because they are unavailable against the federal government.

## VI. Relief Requested

Plaintiff respectfully requests the Court enter judgment in his favor and grant the following relief:

## A. Compensatory Damages (Statutory Cap)

Award Plaintiff compensatory damages in the amount of $100,000, or such lower statutory maximum as the evidence may require under 42 U.S.C. § 1981a(b)(3) as incorporated through 29 U.S.C. § 794a(a)(1), for emotional distress and other non-pecuniary harm proximately caused by Defendant's unlawful conduct.

## B. Equitable and Economic Relief

Pursuant to 29 U.S.C. § 794a(a)(1), Plaintiff seeks equitable and economic relief necessary to make him whole for losses caused by Defendant's disability-based discrimination, denial of reasonable accommodation, retaliation, hostile work environment, and constructive discharge.

## 1. Back Pay and Lost Compensation

Plaintiff seeks back pay from the date of his constructive discharge, November 18, 2022, through the date of judgment. Back pay shall represent the difference between the compensation Plaintiff would have earned as a GS-14 Step 2 employee in the Washington, D.C. locality pay area, including reasonably expected within-grade progression pursuant to 5 U.S.C. § 5335, and Plaintiff's interim earnings.

Back pay includes the value of base salary, locality pay, reasonably expected within-grade step advancement, lost performance-based compensation or bonus eligibility, lost Thrift Savings Plan matching contributions, lost Federal Employees Retirement System service-credit accrual value, lost federal employer health-benefit contributions, lost annual and sick leave accrual value, and other employment-related economic losses proximately caused by Defendant's discriminatory conduct. Plaintiff further seeks prejudgment interest on all back pay and economic losses.

## 2. Lost Leave and Employment Benefits

Plaintiff seeks compensation for the monetary value of sick leave and annual leave depleted, consumed, or forfeited as a foreseeable consequence of Defendant's failure to provide a reasonable accommodation and its discriminatory treatment of disability-related absences. Plaintiff does not seek reinstatement, personnel-action reversal, or retroactive status correction in this action, but seeks compensation for the economic value of lost leave and employment benefits caused by Defendant's discriminatory conditions.

## 3. Front Pay

Plaintiff seeks front pay in lieu of reinstatement, where reinstatement would be impracticable or inappropriate under the circumstances. Front pay is sought to compensate for future lost earnings, diminished earning capacity, loss of continued federal career trajectory, and foregone advancement opportunities resulting from Defendant's unlawful conduct.

## C. Declaratory Relief

Enter a declaratory judgment that Defendant, the **United States Office of Special Counsel**, violated the Rehabilitation Act, 29 U.S.C. § 794 et seq., by engaging in disability-based discrimination and retaliation, including the denial of a reasonable accommodation, interference with the reasonable-accommodation process, improper handling and dissemination of disability-related information, the imposition of disparate and adverse working conditions, and reliance on unsupported and pretextual rationales to justify disability-based restrictions and scrutiny.

## D. Injunctive Relief

Enter appropriate injunctive relief to prevent future violations of the Rehabilitation Act, including:

1. An order prohibiting Defendant from continuing to maintain, rely on, use, disseminate, or otherwise give effect to discriminatory materials, records, evaluations, leave-related compilations, status designations, or stated rationales created or employed in connection with Plaintiff's disability, medical condition, reasonable-accommodation request, disability-related leave, attendance, performance, or separation from employment; and

2. An order requiring Defendant to implement mandatory training for supervisory, managerial, and human-resources personnel regarding obligations under the Rehabilitation Act, including reasonable-accommodation requirements, confidentiality of medical and disability-related information, protections against retaliation, and the prevention of disability-based harassment consistent with 29 C.F.R. Part 1614 and EEOC Management Directive 110.

### E. Costs and Attorney's Fees

Award Plaintiff recoverable costs pursuant to 28 U.S.C. § 1920 and Federal Rule of Civil Procedure 54(d), together with reasonable attorney's fees and litigation expenses, including expert witness fees, as authorized by 29 U.S.C. § 794a(b).

### F. Other Relief

Grant such other and further relief as the Court deems just and proper.

### VII. Demand for Jury Trial

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff hereby demands a trial by jury on all issues so triable, including but not limited to all claims for compensatory damages for emotional distress and other non-pecuniary harm arising under the Rehabilitation Act of 1973, as incorporated through 29 U.S.C. § 794a(a)(1) and 42 U.S.C. § 1981a.

106

## VIII. Conclusion

The factual allegations set forth in this Complaint describe a sustained course of disability-based discrimination by the United States Office of Special Counsel in violation of the Rehabilitation Act. The record described herein reflects the denial of a reasonable accommodation, interference with the interactive process, retaliation for disability-related activity, disparate treatment in the terms and conditions of employment, the creation and perpetuation of a hostile work environment, and conduct that ultimately forced Plaintiff's resignation. The events described occurred after Plaintiff disclosed his disability and sought accommodation and involved escalating restrictions, scrutiny, and disciplinary measures affecting Plaintiff's employment. Plaintiff seeks only the relief authorized by the Rehabilitation Act. The damages and injuries alleged are limited to those flowing from Defendant's discriminatory and retaliatory conduct, including economic losses, emotional distress, and other non-pecuniary harm, together with appropriate equitable and injunctive relief necessary to remedy past violations and prevent recurrence. Plaintiff does not seek relief under any other statutory scheme in this action. Accordingly, Plaintiff respectfully requests that the Court enter judgment in his favor and grant the relief requested in this Complaint.

Respectfully submitted,

/s/ Nathan Strong

Nathan Strong
240 S. Reynolds St
Alexandria, VA 22304
Telephone: (202) 709-6123

March 17, 2026

107

## CERTIFICATE OF SERVICE

I hereby certify that on 17ʰ day of March, 2026, I mailed copies of this complaint and attachments to Defendants by certified mail. A copy will be served upon the United States Attorney for the District of Columbia as required under Rule 4(i) of the Federal Rules of Civil Procedure, by delivery to:

**U.S. Attorney's Office for the District of Columbia**
Attn: Civil Process Clerk
601 D Street NW
Washington, DC 20004

**Attorney General of the United States**
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

**U.S. Office of Special Counsel**
1730 M Street NW, Suite 218
Washington, DC 20036

108

# Table of Contents

Exhibit - A ..................................................................................................3
Exhibit - B - ...............................................................................................19
Exhibit - C - ...............................................................................................20
Exhibit - D .................................................................................................24
Exhibit - E .................................................................................................25
Exhibit - F .................................................................................................26
Exhibit - G .................................................................................................28
Exhibit - H .................................................................................................32
Exhibit - I .................................................................................................35
Exhibit - J .................................................................................................36
Exhibit - K .................................................................................................38
Exhibit - L .................................................................................................39
Exhibit - M .................................................................................................40
Exhibit - N .................................................................................................41
Exhibit - O .................................................................................................42
Exhibit - P .................................................................................................50
Exhibit - Q .................................................................................................52
Exhibit - R .................................................................................................54
Exhibit - S - ...............................................................................................55
Exhibit - T .................................................................................................57
Exhibit - U .................................................................................................58
Exhibit - V .................................................................................................60
Exhibit - W .................................................................................................61
Exhibit - X .................................................................................................63
Exhibit - Y .................................................................................................64
Exhibit - Z .................................................................................................66
Exhibit - AA .................................................................................................67
Exhibit - AB .................................................................................................75
Exhibit - AC .................................................................................................84
Exhibit - AD .................................................................................................90
Exhibit - AE .................................................................................................91
Exhibit - AF .................................................................................................92
Exhibit - AG .................................................................................................98
Exhibit - AH .................................................................................................99
Exhibit - AI .................................................................................................100
Exhibit - AJ .................................................................................................101
Exhibit - AK .................................................................................................103
Exhibit - AL .................................................................................................113
Exhibit - AM .................................................................................................114
Exhibit - AN .................................................................................................116

Exhibit - AO .................................................................................................................124
Exhibit - AP .................................................................................................................131
Exhibit - AR .................................................................................................................138
Exhibit - AS .................................................................................................................139